

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-09-00060-CR

_____


REBECCA SAMFORD, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 123rd Judicial District Court
Panola County, Texas
Trial Court No. 2006-C-0258


Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

OPINION

Rebecca Samford has been before this Court a number of times as a result of a string of contentious domestic disputes.[1] This time we find ourselves in the criminal arena, because Ms. Samford has been convicted of the state-jail felony offense of interference with child custody. *See* TEX. PENAL CODE ANN. § 25.03 (Vernon Supp. 2009).

Archie Morris Samford, Jr., arrived a little before 8:00 p.m. on Friday, July 7, 2006, at the McDonald's in Carthage, Texas, expecting to pick up his son, A.S.,[2] under the terms of an existing child-custody order. He anticipated a special father-son Cub Scout trip to the Johnson Space Center beginning the next morning. By 8:00 p.m., however, his ex-wife, Ms. Samford, had not arrived with A.S. After going by her house, not finding her home, and then returning to McDonald's to make certain she had not arrived after he left, Mr. Samford went to the police station to file an offense report. At approximately 7:30 p.m. the following evening, Ms. Samford dropped A.S. off in front

---

[1]*See In re Marriage of Samford*, cause number 06-08-00085-CV; *In re Samford*, cause number 06-08-00024-CV; *In re A.S.*, 06-07-00044-CV; *In re Marriage of Samford*, cause number 06-05-00040-CV. Ms. Samford and the now late Mr. Samford were married in November 1996. They had a son, A.S., in May 1997. The trial court signed its final decree of divorce in the Samfords' contentious divorce January 25, 2005. The final order awarded divided custody of A.S. between the two parents equally on a specified schedule.

[2]In at least one of the previous Samford cases that have come before us, the son was identified by his initials pursuant to Section 109.002(d) of the Texas Family Code. So as not to undermine the intent of the authority granted by Section 109.002(d), we will continue to identify the son by his initials. *See* TEX. FAM. CODE ANN. § 109.002(d) (Vernon 2008).

2

of Mr. Samford's apartment. Ms. Samford was soon arrested and ultimately convicted[3] of the offense before us now.

We affirm the trial court's judgment, because (1) sufficient evidence established that Ms. Samford knew her retention of A.S. violated a court order, (2) the trial court did not err in denying the proposed instruction concerning conflicts in the custody order, (3) defining reasonable doubt for the jury was not harmful, and (4) including the "take" alternative of the offense in the jury charge was not egregiously harmful.

*(1)*    *Sufficient Evidence Established that Ms. Samford Knew Her Retention of A.S. Violated a Court Order*

Ms. Samford contends that the evidence is legally and factually insufficient to prove she had the state of mind necessary for a conviction. We disagree.

In the summer of 2006, Ms. Samford was to have custody of then nine-year-old A.S. for the first six weeks of summer beginning the day that his school let out. According to the superintendent of schools and the official school calendar for 2006, that date was May 26, 2006. The divorce decree directed Ms. Samford to exchange custody of A.S. six weeks later, on Friday at 8:00 p.m. at McDonald's in Carthage, at which time Mr. Samford's period of custody was to begin. On Friday, July 7, Mr. Samford arrived at McDonald's a little early and waited for Ms. Samford and A.S. to arrive. At about 8:20 p.m., Mr. Samford became concerned and, fearing that Ms. Samford was not

---

[3]Though she initially and repeatedly refused to apply for community supervision, ultimately, Ms. Samford was sentenced to two years' community supervision.

3

bringing A.S. to the designated spot,[4] he left McDonald's and drove by Ms. Samford's residence, but did not see that she was there. Thinking that perhaps he had just missed them, he returned to McDonald's, but to no avail. Then, at about 8:25 or 8:30 p.m., he drove to the Carthage Police Department and filed a report.

The patrol officer drove by Ms. Samford's house several times throughout the evening and night, but never noticed that Ms. Samford had returned. The next day, Saturday, Mr. Samford signed a complaint, and a warrant was issued for Ms. Samford's arrest. Mr. Samford spent the day enlisting the help of friends and family to attempt to locate Ms. Samford and A.S. That evening, at about 7:30 p.m., Mr. Samford answered a knock at his apartment door to find A.S., who waved goodbye to his mother, who then drove off "smiling and waving." Ms. Samford was arrested later that evening.

The Texas Penal Code criminalizes interference with child custody:

> (a)    A person commits an offense if the person takes or retains a child younger than 18 years when the person:

---

[4]There is discussion in the record about Mr. Samford's speculation as to Ms. Samford's motive in retaining A.S. Mr. Samford and A.S. were scheduled to go on a Cub Scout outing to the Johnson Space Center for a camp-in and other activities that weekend, leaving Saturday. Mr. Samford speculates that, although he made some effort to keep the details of the plan a secret from his ex-wife, she discovered the departure date and made an effort to ruin the outing.

> (1)    knows that the person's taking or retention violates the express terms of a judgment or order, including a temporary order, of a court disposing of the child's custody.

TEX. PENAL CODE ANN. § 25.03(a).

Ms. Samford argues that she did not have the requisite intent to retain their son, that she did not—could not—do so knowing that she was violating a court order. It seems that she maintains that conflicts or inconsistencies in the custody provision of the divorce decree could lead to a reasonable mistake that she was required to return A.S. at 8:00 a.m. Saturday, rather than 8:00 p.m. Friday. The inconsistencies, she contends, between odd- and even-numbered years created by the handwritten modification by the trial court means that the custody order was too ambiguous to support her conviction.

Here, the State acknowledges that there were handwritten notations from the judge presiding over the divorce that changed "Friday" to "Saturday" and 8:00 "p.m." to 8:00 "a.m." in the provisions relating to odd-numbered years. The State concedes that these changes could be read to result in a twelve-hour gap in *odd*-numbered years in which no one seems to have custody of the son. The State points out that these changes would not lead to any confusion as to the custody arrangement for the summer of 2006, however. It also points out that, even if Ms. Samford thought she was to return A.S. at 8:00 a.m. on Saturday, she still failed to do so, returning him a little before 8:00 *p.m.* on Saturday. A plain reading of the custody provisions in even-numbered years makes it clear that Ms. Samford was required to return A.S. at 8:00 p.m. Friday. And even the handwritten

5

notations from the trial court in the provision relating to the odd-numbered years would not excuse the fact that she returned A.S. at 7:30 p.m. Saturday.

The record also demonstrates that Ms. Samford knew her retention of A.S. was in violation of the custody order by showing that, although no exchange had ever taken place at Mr. Samford's apartment, Ms. Samford dropped A.S. off at Mr. Samford's apartment that Saturday evening. There is no evidence Ms. Samford attempted to exchange custody at the location designated in the divorce decree and where all other exchanges had taken place up to that point. This would suggest that Ms. Samford knew that Mr. Samford would not be at the designated exchange location at that time on Saturday evening. Further, all other exchanges—Mr. Samford testified there had been at least "dozens" of exchanges made—went without incident, suggesting that the custody provision was clear enough to understand and that this incident was the exception.

There is not a great deal of caselaw on this particular issue. We note that the instant case is unlike the one case that successfully challenged the custody order on which the conviction was based. *See Cabrera v. State*, 647 S.W.2d 654 (Tex. Crim. App. 1983). In *Cabrera*, the temporary order only named the son in the caption and not in the body of the order. *Id.* at 655. The court concluded that the temporary order was not sufficiently specific to give the mother notice that her son's custody had been taken from her. *Id.* Therefore, the evidence was insufficient to support the conviction for interference with child custody. *Id.*

The instant case is more similar to the fact situation in *Perry v. State*, 727 S.W.2d 781 (Tex. App.—Austin 1987, pet. ref'd). In *Perry*, pursuant to the visitation terms of a Missouri decree, the child at issue flew to California to see his mother, the appellant. *Id.* On conclusion of the Christmas vacation period, appellant mother failed to return the child to his father in Texas. After the mother was convicted of interfering with child custody, she appealed, contending that additions made at the time of the decree by the parties and their attorneys rendered the custody order ambiguous. *Id.* at 782. More specifically, she maintained that she did not violate the "express terms" of the Missouri decree, since the terms of the decree were ambiguous regarding who would pay for the child's return transportation costs. *Id.* at 781–82. The court noted that there was some merit to the mother's contentions with respect to paragraph 3, but disagreed that paragraph 3 was the key to resolution of the appeal. *Id.* at 783. The court declined the mother's invitation "to consider certain portions of the consent decree in isolation without reference to other portions of the decree which are free of any ambiguity." *Id.* The court went on to conclude that the Missouri decree, when read as a whole, unambiguously set forth the beginning and ending dates for the 1985 Christmas vacation period. Since paragraph 2 clearly stated that the mother's visitation rights ended on December 31, 1985, when she withheld the child from his father beyond that date, for whatever reason, she was in violation of the Missouri decree. The *Perry* court reviewed the evidence and had "no difficulty

7

concluding that the trial court could have found all elements of the crime beyond a reasonable doubt." *Id.*

Legally and factually sufficient evidence supports the jury's verdict.

*(2)*     *The Trial Court Did Not Err in Denying the Proposed Instruction Concerning Conflicts in the Custody Order*

In connection with her efforts to undermine the State's proof of a culpable state of mind, Ms. Samford unsuccessfully requested the following instruction, which she characterizes on appeal as a mistake-of-fact instruction:

> If you find that provisions on pages 11–12, Paragraphs 6 and 7 of the Final Decree of Divorce in Cause # 2004-D0042 relating to visitation are in conflict as to the return of the child [A.S.] you shall find the Defendant Not Guilty.

This is not an accurate statement regarding mistake of fact. *See* TEX. PENAL CODE ANN. § 8.02(a) (Vernon 2003).

> It is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense.

TEX. PENAL CODE ANN. § 8.02(a).

Generally, an instruction on the mistake-of-fact defense should be given when evidence raising the issue of whether the actor formed a reasonable belief about a matter of fact, if his or her mistaken belief negated the kind of culpability required for the commission of the offense. *See Sands v. State*, 64 S.W.3d 488, 495 (Tex. App.—Texarkana 2001, no pet.). Even if such instruction is repetitive of the required proof that the jury find beyond a reasonable doubt that the defendant

8

intentionally and knowingly committed this required element of the crime, the mistake-of-fact instruction must be given to the jury when the issue is raised by the evidence. *See id.* at 495–96.

It is proper, however, for the trial court to refuse requests for instructions that are vague, misleading, or incorrect statements of the law.[5] *Mutscher v. State*, 514 S.W.2d 905, 926 (Tex. Crim. App. 1974); *Stewart v. State*, 438 S.W.2d 560, 561 (Tex. Crim. App. 1969); *Traylor v. State*, 43 S.W.3d 725, 730 (Tex. App.—Beaumont 2001, no pet.); *Gill v. State*, 670 S.W.2d 758, 761 (Tex. App.—Corpus Christi 1984, pet. ref'd). This requested instruction appears to fall within the category of instructions that are vague or misleading. That is true, because whether the odd-numbered and even-numbered years' provisions are in conflict with one another is not dispositive of whether Ms. Samford knew her retention of A.S. in the summer of 2006 violated the custody order. That visitation was governed by the provisions for even-numbered years regardless of whether those provisions "mirrored" precisely the provisions for odd-numbered years. Further, when the instruction was proposed, there was no mention that Ms. Samford was operating under a mistake of fact. The above-requested instruction is not sufficient to put the trial court on notice that Ms. Samford was requesting a mistake-of-fact instruction. The requested instruction fails to mention any of the elements of the defense under Section 8.02 of the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 8.02(a). It fails to address the issue that, because of those conflicts, Ms. Samford mistakenly

[5]As will be discussed in more depth, even if the requested instruction is an accurate statement of the law, there is no harm in its denial if it is substantially the same as one already contained in the court's charge or if the subject matter it concerns is adequately covered in the court's charge. *See Valentine v. State*, 587 S.W.2d 399, 402 (Tex. Crim. App. 1979).

interpreted when the custody order directed the exchange of custody. We conclude that denial of the requested instruction was not error.

*(3)      Defining Reasonable Doubt for the Jury Was Not Harmful*

Ms. Samford also asserts that a reasonable-doubt definition was improperly given to the jury.

Review of asserted jury-charge error involves a two-step process that first calls on this Court to determine whether there is error and then to determine whether any error is harmful. *See Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).

Ms. Samford relies heavily on *Paulson v. State*, 28 S.W.3d 570 (Tex. Crim. App. 2000), to support her position that inclusion of a reasonable-doubt definition was reversible error because not all parties agreed to its inclusion. *Paulson* does not go quite this far. In overruling *Geesa v. State*, 820 S.W.2d 154, 162 (Tex. Crim. App. 1991), in part, and *Reyes v. State*, 938 S.W.2d 718 (Tex. Crim. App. 1996), in its entirety, the *Paulson* court concluded as follows:

> We specifically overrule that portion of *Geesa* which requires trial courts to instruct juries on the definition of "beyond a reasonable doubt." We also overrule *Reyes*. We find that the better practice is to give no definition of reasonable doubt at all to the jury.
>
> On the other hand, if both the State and the defense were to agree to give the *Geesa* instruction to the jury, it would not constitute reversible error for the trial court to acquiesce to their agreement.

10

28 S.W.3d at 573. It did not explicitly conclude that inclusion of the instruction was reversible error in the absence of an agreement to include it.[6] To the contrary, the overwhelming majority of cases since *Paulson* dealing with inclusion of a reasonable-doubt definition without agreement of the parties have analyzed the inclusion of the unagreed-to instruction for harm. *But see Colbert v. State*, 56 S.W.3d 857 (Tex. App.—Corpus Christi 2001), *rev'd on other grounds*, 108 S.W.3d 316 (Tex. Crim. App. 2003) (those grounds being that *Paulson* was not to be applied retroactively). This Court has held that inclusion of a *Geesa* definition in the jury charge was error, but found that error to be harmless. *See In re C.S.*, 79 S.W.3d 619, 622 (Tex. App.—Texarkana 2002, no pet.).

While the reasonable-doubt definition in the jury charge here included some minor paraphrasing of the *Geesa* definition's language and some minor changes in the ordering of ideas, it was substantially similar to the full *Geesa* reasonable-doubt definition. Therefore, since the parties did not agree to its use, there may have been error here. But, since Ms. Samford did not object to the inclusion of the instruction at trial, she is saddled with the heavy burden of showing egregious harm. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). In her brief, Ms. Samford acknowledges her substantial burden of showing egregious harm, but does not explain how she might have been harmed by the inclusion of the reasonable-doubt instruction.

---

[6]There is some confusion as to the breadth of *Paulson*'s holding. While the court noted that it was the better practice not to include a definition of reasonable doubt, it did not clearly state that doing so in the absence of an agreement was reversible error. *See Vosberg v. State*, 80 S.W.3d 320, 323–24 (Tex. App.—Fort Worth 2002, pet. ref'd); *Dooley v. State*, 65 S.W.3d 840, 844 (Tex. App.—Dallas 2002, pet. ref'd).

11

The record shows no harm to Ms. Samford by the inclusion of the reasonable doubt instruction. Many courts have pointed out that language similar to the *Geesa* definition actually favors the defendant. Chief Justice Cornelius wrote that, after reading *Paulson*'s description of the *Geesa* reasonable-doubt instruction "it is obvious that the majority [of the *Paulson* court] believed the definition favored the defendant because, if the jurors properly applied it, they would be less likely to convict." *In re C.S.*, 79 S.W.3d at 622. With that in mind and "in the complete absence of any explicit suggestion" by Samford as to how the definition harmed her, we conclude that the error did not cause Ms. Samford egregious harm. *See id.* We conclude that any error in including the reasonable doubt instruction here was harmless error and overrule this point of error.

*(4)* *Including the "Take" Alternative of the Offense in the Jury Charge Was Not Egregiously Harmful*

The jury charge provided "that it is an offense for a person to take or retain a child." It went on: "In order to find the defendant guilty you must find from the evidence . . . that the defendant took or retained a child, [A.S.] . . . that defendant knew at the time that her conduct, if any in taking or retaining said child. . . ." The application paragraph contains similar references to "take" or "retain."

Again, review of asserted jury-charge error involves the two-step process that first looks for error and then identifies harm from such error. *See Abdnor*, 871 S.W.2d at 731. Here, the State all but concedes that inclusion of references to "take" in the charge is error but maintains that the error is harmless: "The State agrees, that to the extent the charge authorized the jury to convict for on [sic]

12

a theory of culpability not plead [sic] in the indictment—that is, illegally *taking* possession of the child—then it is erroneous.  However that does not mean reversal is mandated."

We observe that, since Ms. Samford did not object to the jury charge's reference to "take," she again must show that she suffered egregious harm, that is, whether

> the error is so egregious and created such harm that [s]he has not had a fair and impartial trial–in short[,] egregious harm. . .  [T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record  of the trial as a whole.

*Trejo v. State*, 280 S.W.3d 258, 261 (Tex. Crim. App. 2009) (quoting *Almanza*, 686 S.W.2d at 171).

Ms. Samford points to the following note from the jury as evidence of egregious harm: "We the jury do not agree with the fact that this is a felony offense.  That being said, our decision/verdict was arrived at based on the guideline we were given and the facts of the case."  The jury's note went on to ask questions concerning punishment and community supervision.  According to Ms. Samford, the note demonstrates that the jury struggled with the verdict and, therefore, that she suffered egregious harm by the error.  The note was generated, however, during the punishment phase; the jury's deliberation relating to guilt/innocence took only twenty-eight minutes.  More importantly, it does not appear that the jury's struggle had anything at all to do with the "take" language.  To the contrary, the jury's note demonstrated only its disagreement with the perceived harshness of classifying this offense as a felony.  In fact, it could be said that the jury's note demonstrates its

13

understanding (indeed its frustration) that the case involved keeping A.S. for less than a day longer than allowed under the divorce decree.

Certainly, the State never made any allegation that Ms. Samford "took" A.S. in violation of the divorce decree. The State's theory remained that she kept or "retained" A.S. in violation of the divorce decree: "So I think we've proved that she knew her conduct in retaining the child was in violation of the order." Likewise, the reporter's record shows that Ms. Samford did not present evidence to undermine any theory that she "took" A.S., suggesting that there was no evidence to show that she did so. Her defensive theory revolved around the conflicts between custody provisions for odd- and even-numbered years that might be said to create an inconsistency that could somehow excuse her failure to return A.S. at the proper time. Mr. Samford's testimony makes no mention whatsoever that Ms. Samford took A.S. from him. In closing argument, the State made clear that there was no evidence that she "took" A.S.: "Our law provides that is an offense to – now, there's no talking about taking the child. We're talking about it's in the law."

The record does not show that Ms. Samford suffered egregious harm. It fails to reveal that Ms. Samford was at risk of being convicted on a theory not alleged in the indictment. We conclude that any error from including the "take" language in the jury charge was harmless and overrule this point of error.

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     October 21, 2009
Date Decided:      December 17, 2009

Publish