### MISSOURI–KANSAS–TEXAS RAILROAD COMPANY OF TEXAS, Appellant,

v.

### R. M. NOBLE, Jr., Appellee.

No. 15530.

Court of Civil Appeals of Texas.

Fort Worth.

July 2, 1954.

Rehearing Denied Sept. 17, 1954.

Fred L. Wallace, Fort Worth, for appellant.

Walker & Day, Joe Day, Jr., Fort Worth, for appellee.

MASSEY, Chief Justice.

The trial court entered a judgment for the plaintiff in a suit filed by him against a railroad to recover damages resulting from loss of profits on a transaction the plaintiff had contracted to make with a third person because of acts or omissions on the part of the defendant which defeated the transaction, and to recover other damages sustained by him pursuant to such transaction. Plaintiff claimed that he was persuaded or induced to purchase cattle for sale to the third person, with whom he contracted at a certain price, because of the fact that the appellant represented that it could and would ship the cattle at a certain time, and further because of the fact that under the circumstances existent, to-wit: the availability to defendant of cars by which the shipment could have been made, and defendant owed him the duty of shipping the cattle at such time. Plaintiff contended that since the defendant breached such duty to him, it was responsible for the difference between the price he would have received for the cattle had the shipment been made and the market value existent immediately following his discovery of defendant's breach of duty. Plaintiff prevailed by his suit and recovered damages arrived at by deducting the market value found by the jury to have been existent upon the next regular "market day" following defendant's breach of duty, from the price plaintiff would have received from the third party had his contract not been defeated by the breach. From this judgment the defendant appealed.

Judgment affirmed.

Appellee R. M. Noble, Jr., is what is known as a "commission man" at the Fort Worth Stockyards. Such a person makes his profit by reason of the fact that he sells at a greater price than the price he pays. Of course, when he buys at a certain time with the sale to be made at a later time he ordinarily undertakes the expense of lodging and maintenance of the cattle in the meantime. Where he utilizes the facilities of a service company, commonly called a "commission company", in disposing of his cattle, he pays for the services.

On date of Friday, October 12, 1951, during the morning of that day and at a time when the regular cattle trading market on the Fort Worth Stockyards was open and active, the appellee learned of the availability of a certain herd of cattle, comprising 197 head, located in the pens at the market. He telephoned a prospective purchaser at Edna, Kansas, and made a contract with such prospective purchaser, the terms of which provided that such purchaser would buy said cattle and pay 20¢ per pound therefor, multiplied by the total weight of said 197 head as weighed at Fort Worth on that day, *provided* the appellee could and would see that they went out on the train of appellant, Missouri-Kansas-Texas Railroad Company of Texas, leaving Fort Worth on the night of October 12th for Edna, Kansas. The purchaser agreed to pay the freight and other charges incident to transportation. In turn, the appellee called upon the owner of the cattle, and made a contract with him, the terms of which provided that appellee would buy said cattle and pay 19.75¢ per pound therefor, multiplied by the total weight of said 197 head as weighed in Fort Worth on that day, *provided* appellee could arrange that they would go out on appellant's train leaving that night. Appellee then went to the proper office of the appellant company and there informed the appellant, through its agents, the fact that he could make both trades and that he would make them if the appellant could and would supply the seven or eight railroad cattle cars required for the transportation to Edna, Kansas, on that date and could and would make said cars, loaded with the 197 head of cattle, a part of the train leaving that night for Edna, Kansas. Appellee was advised that the cars were available and could be loaded with his cattle and as so loaded would be transported to Edna, Kansas, on the train leaving that night, and that he should "go ahead and get his cows bought."

These events occurred prior to the noon hour on date of October 12th. Appellee did not wait around appellant's offices and take the time to prepare an order in writing relating to any specific description of cars he desired, or to file any order in writing whatever, but left immediately and confirmed his purchase from the owner of the cows and consummated the purchase. He also attended to the necessary weighing and transferring of the cattle and he assumed control over them and had them moved into the proper place for loading onto appellant's cattle cars. Then the appellee returned to his offices which were located in the same building with the office of the appellant. The paper work connected with the ordering of the railroad cattle cars from the appellant to ship his cattle was attended to and his order therefor in writing was delivered to the office of the appellant, and into the hands of its agent. This took place between 1:30 o'clock and 2:00 o'clock in the afternoon on October 12th. Appellee then left the stockyards premises and went home. The cattle market ceased to be open and active at noon on that date, a Friday. The market does not and did not open the following day and it was also closed Sunday. The market does open on Monday, and it did open on Monday, October 15th, and became active during that day.

At about 4:30 o'clock on the afternoon of October 12th the appellee learned that the appellant was not going to ship the cattle that night. He went to the appellant's office to make inquiry and was advised by the appellant's agent that the cattle were not shipped as he anticipated because, as appellant claimed, it did not have the cattle cars in which to ship them that night. As a matter of fact, evidence adduced upon the trial showed that appellant could have furnished the necessary cars that day and if it had done so could have transported the cattle as appellee contemplated. Appellant indicated that it could and would ship the cattle the next day. Appellee then telephoned the Kansas customer to advise him and ascertain whether he would make the same contract formerly agreed upon, and pay the same price for the cattle though shipped at a later date. The Kansas customer refused to do so, but did counter with another proposition whereby the customer would take the cattle on delayed delivery at a lower price. This price would have been approximately $1,970 below the former price. Under the former price the appellee would have realized a profit of approximately $330, so under the Kansas customer's new proposition appellee would not only lose his profit, but about $1,640 in addition. He elected to hold the cattle until the regular market on the Fort Worth Stockyards opened on Monday, October 15th. No trade was ever made with the Kansas customer, the condition of the original contract having been unsatisfied.

When the regular cattle market became open and active on Monday, October 15th, it was discovered that the price for "stocker cattle", the character of the 197 head in question, was not as good as that obtainable the previous week. Market values were lowered. Appellee's evidence relating to market value of his cattle demonstrated that their reasonable market value at that time would be based upon a poundage value of 16¢, multiplied by the number of pounds all the cattle weighed at the time. Appellee's evidence also showed that he sold the cattle in small lots, primarily through the services of several different commission companies, for which services he paid a price, obtaining a price per pound for each group sold which was greater than 16¢ per pound. The prices obtained varied from 17.75¢ per pound to 21¢ per pound. Some of the lots were sold on October 15th, some on October 16th and some on October 17th. From the evidence, our calculation of the total weight of all the animals at the time they were sold amounted to 148,494 pounds, and the total gross price received therefor at $27,018.54. This figure is without consideration of expenses of maintenance until they were sold, expense of sale, etc.

The weight of the animals at the time they were weighed for purposes of determining what appellee's Kansas purchaser would owe him was 148,510 pounds, which under the contract would call for a price of $29,702. The jury found that the value of

the animals on October 15, 1951, was $26,-730, and seemingly they must have arrived at this figure by calculating a value per pound at 18¢ rather than the 16¢ appellee's expert testimony on market value demonstrated. This was more nearly in line with the price appellee actually realized as a net figure upon his sale of the cattle in smaller lots, though at a greater expense per animal sold.

By their answers to special issues submitted, the jury found that appellee's Kansas purchaser did contract with him to pay for the 197 head of cattle a price of 20¢ per pound, conditioned upon their shipment on the 12th of October, 1951, with the purchaser to pay the freight; that prior to the time of appellee's written requests for the necessary cattle cars to ship the cattle to Kansas appellant knew that appellee's contract with his Kansas purchaser was conditioned upon the cattle being shipped on October 12th; and that the appellant in the exercise of reasonable diligence could have furnished the cattle cars and enabled a shipment of the cattle on October 12th as contemplated, after the time of day when it received the appellee's written request for such cars. They also found the market value of the 197 head of cattle on date of October 15, 1951, to have been $26,-730. The court deducted the amount found as the market value on October 15th from the price appellee would have received from his Kansas purchaser had the cattle been shipped on the 12th, arrived at the figure of $2,972, and entered this amount, plus interest from October 12, 1951, as the judgment.

It is from this judgment that the appeal was taken.

Most of the points of error urged on appeal would be settled by a determination of what measure of damages would be a proper measure under the circumstances of the case and whether the market value of the livestock at Fort Worth on October 15, 1951, was a proper value at a proper time by which the amount of damages would be controlled; whether a price which was offered for the livestock before Octo-

ber 15th and which was higher than the market value for the livestock on that date had any effect upon the damages or their measure; whether the evidence introduced upon the market value of the livestock on October 15, 1951, satisfied the requirements of law and supported the submission of an issue on damages; and if so, whether the form of special issue submitted constituted a charge on the weight of the evidence.

The balance of the points urged would be settled by a determination of whether a reversible error resulted through the introduction of improper evidence, and by a determination of whether the liability of the appellant was properly plead and proven, whether the court's charge and the jury's findings were based upon and supported by evidence which was within the pleadings, and whether the judgment was supported by the verdict.

In cases where a shipper's contract with a third person is conditioned upon delivery of his merchandise to its destination by a certain time and such contract is defeated as result of late delivery through the carrier's negligence the measure of damages is the difference between the contract price which would have been received had delivery been made on time and the market value of the merchandise at that place at the time it actually arrived. Texas & Pacific Ry. Co. v. Stewart, 1905, 38 Tex.Civ.App. 595, 86 S.W. 631. This would be conditioned, of course, upon the carrier being on notice of the contract. Where no such contract was defeated, but through negligently late delivery the market value of the merchandise is less upon arrival than it would have been had it been delivered on time, the measure of damages would be the difference between the two market values ascertained at time of actual delivery and at time delivery should have been made,—or if through the carrier's negligence shipment was not made at all, the measure of damages would be the difference ascertainable by deducting from the market value obtainable at the point of delivery had delivery

been made at the proper time the market value at the point of origin at the time the carrier breached its duty, and then—in turn—deducting from the resulting figure the expense of carriage. Missouri, Kansas & Texas Ry. Co. of Texas v. Witherspoon, Tex.Civ.App., 1897, 38 S.W. 833, on subsequent appeal at 18 Tex.Civ.App. 615, 45 S.W. 424; Gulf, Colorado & Santa Fe Ry. Co. v. Martin, Tex.Civ.App., 1894, 28 S.W. 576.

It logically follows that a proper measure of damages is the difference between the contract price obtainable under the contract at the point of origin of a shipment at the time the carrier should have begun transportation of merchandise—and the market value of the merchandise at the same point at the time the carrier failed to transport it, or at the time the carrier notified the owner that it was not going to transport it. It must be remembered that appellee's sales contract was a conditional one, the condition being the shipment of the cattle on the evening of October 12th. Title, subject to the condition, was to vest in the Kansas purchaser at Fort Worth, and not at the point of delivery.

The question remains as to whether the trial court properly took the market value of the cattle on October 15th instead of October 12th. Under the circumstances of the case October 15th was properly taken. At the time appellee was informed that the cattle would not be transported by the train leaving the night of October 12th, the regular market at the Fort Worth Stockyards was closed. It did not reopen until October 15th. That day was the first upon which there was a regular open and active market available to dispose of the character of merchandise in question. Under such circumstances October 15th was the proper date to ascertain what market value should be deducted from the contract price in ascertaining damages. 8 Tex.Jur., p. 529, sec. 365; Southern Kansas Ry. Co. of Texas v. Crump, 1903, 32 Tex.Civ.App. 222, 74 S.W. 335, error refused; Gulf, C. & S. F. Ry. Co. v.

Russell, Tex.Civ.App., Austin, 1930, 27 S.W.2d 608.

Upon the afternoon of October 12th, after appellee was informed that his cattle would not be shipped as per his understanding when he bought them, and upon his immediately telephoning his purchaser in Kansas,—the Kansas purchaser made the appellee the proposition that he would accept the cattle by delayed shipment upon a new contractual arrangement whereby the appellee would be paid $1,970 less than the contract price by which the Kansas purchaser would have been bound had the cattle gone out on the night train of October 12th. Appellant contends that appellee should have accepted the proposition, thus limiting the damages claimed to the figure of $1,970. Substantially, the effect of appellant's argument in this connection is that it is not the market value of the cattle (as ascertained upon the opening of the market on October 15th) which would constitute a terminus of the yardstick measuring the damages, but instead a price obtainable before market value became ascertainable should constitute that terminus. Appellant's argument in this regard is without merit, as demonstrable by considering that when the regular market did open it might have been such that the value of the cattle would be exactly the same as the price appellee had paid for them on the 12th. It is not conceivable under such a circumstance hypothecated that the appellant would have urged that a measure different from the market value should constitute the terminus. In the actual case at hand subsequent developments in the market demonstrated that the appellee would have been wise to have taken $1,970 less for his cattle, but in the hypothecated circumstance he would have been foolish had he done so. Any proper measure of damages must not depend upon whether a party was wise or foolish, nor depend upon any hindsight test. A proper measure must be one such as is available to all alike with equal fairness and must have the degree of reasonable certainty. The only proper terminus is the market value at the time when the regular market

has opened and become active. Furthermore, appellant never advanced the proposition as an affirmative defense, nor did it request any issue upon whether appellee should have sold the cattle at the price the Kansas purchaser offered upon a late delivery.

As we have related, appellee did not weigh all 197 head of cattle on October 15th. He weighed only those of the cattle he then sold. Five head were sold on October 16th and weighed on the day of sale. The balance were weighed on October 17th. Appellee, as was entirely proper, elected to prove his loss by showing the value per pound of the type of cattle in question on October 15th, then by evidence demonstrating the poundage in all the cattle on October 12th, and all the poundage of each group of cattle as they were weighed upon the occasion of their sale over the three day period, October 15th, 16th and 17th. Our own calculation from this evidence indicates that the 197 head of cattle, considered as a unit, weighed sixteen (16) pounds less at the time of sale than they weighed when appellee purchased them on October 12th. If we are correct, then, considering the nature of the merchandise under consideration, such a shrinkage in weight would be normal and for our purposes insignificant, and the evidence conformed to that degree of certainty as to weight of the cattle on the material date of October 15th to entitle the jury—by the consideration thereof—to arrive at the value of the cattle on the 15th. Furthermore, absent evidence demonstrating some unusual decrease in weight after the cattle were weighed on the 12th, we believe that the weight at that time was sufficiently proximate in time to constitute proof of probative force and value of their weight on the 15th.

Appellant's statement about what the evidence shows the cattle to have weighed when sold differs with our calculation. It contends that the evidence showed that the 197 head of cattle increased in weight between October 12th and the days of sale by an average of 95 pounds per head. If appellant is correct, we fail to see how he could complain, for every pound the cattle gained inured to its benefit and operated to reduce the amount of the damages for which it was claimed to be liable. If error was entailed it appears to be error of which appellee, and not appellant, would have cause for complaint.

The evidence supports the submission of the special issue inquiring of the jury the value of the cattle on October 15th. The evidence before the jury was such that they necessarily multiplied what total poundage they found the 197 head of cattle weighed on that date by the value per pound which was the market value. In arriving at the market value of the cattle the jury actually found both weight and value per pound, but gave neither as their answer. They gave an answer which seemingly was one multiplied by the other. If they adopted this method then they arrived at a valuation by the same method all merchandise valued by weight is arrived at in merchandising transactions.

Appellee plead sufficiently to show what price per pound he paid for the cattle on October 12th, and the number of pounds then in the 197 head. He likewise plead sufficiently to show the price per pound on October 15th at 16¢ and the number of pounds total weight of the cattle on that date. In order to ascertain the weight he alleges, one has to divide 16¢ into the figure he alleged as a total valuation on the 15th, and while this is cumbersome it does meet the requirements of pleading. He followed these allegations with allegations of the sales he made of the cattle on October 15th, 16th and 17th, alleging the total amount of money he received, but alleging no fact whereby the weight or average price per pound thereof could be ascertained. Apparently he calculated the amount of damages prayed for by deducting the total net price he received from the contract sales price to his Kansas customer. This we assume because the figures match. The figures only amount to about ¾ths the total damages he might have prayed for had he deducted the value at 16¢ per pound from

the contract sales price. Despite our conclusions so drawn from his prayer, the prayer could be properly construed to be based on either the one premise he alleged for a recovery or upon the other. Of course only one premise alleged would support the special issue on damages which was submitted. His proof conformed to his allegations under that premise of his pleading. Therefore the issue was raised by both the pleadings and the evidence, thus satisfying the requirements of law and supporting the submission of the special issue on damages.

Appellant contends that the special issue submitted to the jury, in answer to which they found the value of the 197 head of cattle in question in dollars and cents, was an issue which charged the jury upon the weight of the evidence for several reasons, to-wit: (1) It assumed that the date of October 15, 1951, was the date to determine the measure of damages sustained by appellee; (2) it assumed that the cattle in question had a cash market value in Fort Worth, Texas, which was a disputed fact; (3) it assumed that the cattle comprising 197 head was a herd, or entity, which was a disputed issue of fact.

■■■ We do not believe that appellant's contentions are well founded. Having held that the market value of the cattle on October 15, 1951, was a proper date to consider as a factor fixing the amount of damages sustained by appellee, it necessarily follows that such assumption of the court in the framing of the issue was proper. The Fort Worth Stockyards and its Exchange is nationally known as one of the foremost cattle markets in the United States, of which we can take judicial notice, and even though the record had been void of evidence that the cattle in question had a market value at that place on the market-day of October 15, 1951 (which was not the case as the record is replete with testimony as to what the market value of the cattle was at such place and time), we could take judicial notice that cattle there located have a market value. So could the trial

court. The number of head of cattle in question was established by clear and unequivocal evidence to have been 197, and this was not contradicted, and this number of head of cattle as a quantity, as well as the number of pounds total weight of the 197 head as a quantity, would serve as a quantitive standard and yardstick or rule whereby the total value of the cattle might be ascertained. The charge as embodied in the special issue on market value did not necessarily assume or direct that the jury should find the value of the 197 head of cattle as a herd. The jury was permitted by the form of the issue to exercise all the discretion with which it is endowed by law in arriving at a decision of whether the cattle would be considered as a herd or in some other proper manner. No part of the issue constituted a charge upon the weight of the evidence. No fact, which was a fact in issue or in controversy, was assumed by the court in framing the issue.

Appellant predicates a point of error upon a contention that the appellee based his suit for damages upon the failure of a carrier to comply with a regulation of the Interstate Commerce Commission. Appellant contends that the appellee therefore was bound to introduce the regulation into evidence as a part of his case, and not having done so the court should have rendered an instructed verdict in favor of the appellant as appellee's default demonstrated that he had not made out a prima facie case.

Appellee claims that his suit was not brought upon the failure of a carrier to comply with a regulation. He contends further that such applicability the regulation in question has to the suit, if any, would be defensive in so far as the appellant is concerned, and of no concern to the appellee except in the event the appellant advanced it affirmatively to defeat appellee's recovery of a judgment or as a "roadblock" to a recovery by him. Appellant did plead the regulation's pertinent parts. It was never introduced in evidence. Such was unnecessary, as appellee plead the same part of the regulation.

The regulation in question and its material parts are the Southwestern Lines Tariff 187N and 188, Item 360, which is on file with the Interstate Commerce Commission and which is a part of the rules and regulations under which the appellant railroad operates and which provides:

"Item 360. Orders for cars must be placed with the carrier's agent in writing, a reasonable time in advance, stating the number, size and kind of cars, destination and date wanted. For convenience, cars may be ordered by telephone, in which case confirmation must be given in writing."

By provision of Section 16, paragraph 13, of the Act of Congress to regulate commerce, 49 U.S.C.A. § 16 (13), it is provided that the Secretary of the Interstate Commerce Commission may make certified copies of the whole or any part of certain records, including the record of the regulation in question, which shall be received in evidence upon the trial of any cause of action with like effect as though the original record itself was introduced. Without citing appellant's authorities we will state that we recognize the fact that in instances where a plaintiff founds his cause of action upon a violation of a regulation such as the one including "Item 360" quoted, then he has not established a prima facie case, absent stipulation in or apart from the pleadings of both parties, unless he introduces the regulation he relies upon along with evidence demonstrating that the defendant has violated the regulation to his prejudice and damage. On the other hand, we believe that in those instances where the plaintiff's cause of action is founded upon the common law, or upon the common law as qualified by provision of a statute or Constitutional article, or upon a statute or Constitutional article of which the courts will take judicial cognizance, the plaintiff is not obliged to either plead or prove the law but need plead and prove only a breach of obligation of the law upon which he may be said to rely, resulting to his prejudice and damage. 13 C.J.S., Carriers, § 38a, p. 76; Warner v. St. Louis-San Francisco Ry. Co., 1925, 218 Mo.App.

314, 274 S.W. 90. · In the present instance appellee's cause of action must be considered as one brought under the provision of a federal statute. It is not, however, a suit brought under authority of any regulation enacted pursuant to the statute. Had appellant desired to rely on the regulation as an affirmative defense, it could have affirmatively plead it and proved it and the appellee's failure to comply with it, and if such proof was uncontroverted, it would have been entitled to an instructed verdict. Davis v. Henderson, 1924, 266 U.S. 92, 45 S.Ct. 24, 69 L.Ed. 182. The appellant did rely on it and did plead it. However, there was no issue upon the fact that appellee did or did not order the cars in writing. It is undisputed that he did so order them about 1:30 or 2:00 o'clock on the afternoon of October 12th. The issue then was whether the appellant could have conveniently furnished them upon that day following its receipt of the written order. Under the circumstances of this case, the burden to introduce the regulation was upon the appellant, if it was material at all. Appellant was relieved of its burden to offer it because appellee plead it. This operated to obviate any issue upon the fact of its existence and its force and effect, none of which appear to have been in issue anyway.

In former years, before regulation by Congressional Act operated to inhibit such, there was nothing which prevented a carrier from contracting with a shipper to supply him with a certain number of cars for the purpose of shipment, or from contracting to ship from a certain point at a certain time, or to a certain point at a certain time. It is recognized that in many instances a railroad carrier is a monopoly. It could favor one shipper over another. It could leave a shipper desiring to ship merchandise standing by unserved, with his stock of goods perhaps spoiling, while more favored shippers who requested service at a later time were getting their merchandise onto railroad cars and away to their points of destination under the very eyes of the earlier comer whose profits perhaps were lost by the delay and whose losses were be-

ginning to accrue as result of the continued delay. The purposes of the Interstate Commerce Act included the prohibition of such practices on the part of the railroads. Neither the Act itself, nor any other, nor any regulation of the Interstate Commerce Commission was intended to act in such a manner as to operate to defeat a just cause of action a shipper might have against the railroad for its failure to perform its obligations. The Act and the regulations promulgated thereunder by its authority do afford the railroads certain defenses which they may use in an affirmative manner to demonstrate that they have abided by the law and the regulations, and that it was through such obedience that a shipper's loss occurred, rather than through any negligence or failure of duty on the part of the carrier, or that a shipper's cause of action was barred because of his failure to comply with requirements of law or regulation.

From the pleadings on file in the case it is noted that the appellee plead the quoted part of the Southwestern Lines Tariff by way of a trial amendment. Appellee stated that he was obliged to do this by a ruling of the trial court upon an exception to his other pleadings upon which he went to trial. There is nothing in the regulation which could possibly aid appellee's case. Indeed, the contrary appears. No part of his other pleadings appear to be stricken, or if any part was, there still appears therein his allegations of fact as set forth in the forepart of this opinion, particularly that he was assured by appellant that the cars he desired and needed, if his contract with his Kansas purchaser was to be made, were available to him and would be furnished and that his contract could be safely entered into. He also plead that the cars were in the hands of the appellant and in position to be furnished by it, as he was informed, at the time he made his request in writing for them, but that they were not so furnished. He plead that he lost his contract and sustained his damages as result of the failure on the part of the appellant to furnish the cars. The pleadings were sufficient.

■ Appellee proved that the cars he needed and ordered were in the hands of the appellant in such manner that it could have and should have made them available to him. The law provides that where such cars are in the hands of the carrier in such manner that they could by the exercise of reasonable diligence furnish them to the shipper, the requirements of law demand that it furnish them, and when it does not do so, when it should, the carrier is liable. 8 Tex.Jur., p. 64, sec. 25; 13 C.J.S., Carriers, § 38 p. 76. It will be readily perceived the effect the statute had upon the form of proof. In the period prior to the enactment of the statute a shipper would make his proof by displaying the provisions of a contract breached. Under the statute he must demonstrate that the carrier had cars available at the time of his order therefor which in the exercise of reasonable diligence they could furnish and make available to the shipper for the shipment of his merchandise, or he must otherwise prove circumstances demonstrating unreasonable delay. 13 C.J. S., Carriers, § 37, p. 75; Williams v. St. Louis-San Francisco Ry. Co., 1925, 217 Mo. App. 662, 274 S.W. 935. Thus may his suit for damages be predicated in conformity with the statute. Of course, the same evidence would have made out a case at common law. Actually the duty to furnish cars is a duty at common law, and the recitals of the Interstate Commerce Act on that point is simply declarative of the common law. Warner v. St. Louis-San Francisco Ry. Co., supra. Nevertheless, since the Act applies to the transaction and prescribes the right to bring an action growing out of it, the cause of action shall conclusively be deemed to have been brought under its provisions. Williams v. New York, P. & N. R. Co., 4 Cir., 1926, 11 F.2d 363, 45 A.L.R. 437.

■ The special issue submitted to the jury inquiring whether the appellant, in the exercise of reasonable diligence, could have furnished the cars that the appellee ordered in writing at a time which would have enabled a shipment of the cattle on the evening of October 12, 1951, was supported by testimony from the employees of the appellant and from written records in appellant's own offices. The form of the issue was correct. Ft. Worth & D. C. Ry. Co. v. Strick-

land, Tex.Civ.App., Amarillo, 1919, 208 S. W. 410. The jury's affirmative answer logically followed from the evidence. By such answer was established the appellant's liability for appellee's loss.

Since appellee plead and proved a prima facie case of negligence and damage the court acted with complete propriety in overruling appellant's motion for an instructed verdict.

The appellant complains because the appellee offered in evidence the sales records of the various commission companies which were involved in the sales of the cattle in question over the three-day period, October 15, 16 and 17, 1951. These records showed the weight in pounds of a certain number out of the entire 197 head of cattle, and the price per pound and the total price each commission company received and credited to the account of the appellee. The total amount credited to appellee's account was the net price appellee received as result of the transaction. In other words, the appellee, in connection with each transaction, hired the services of a commission company which sold the cattle for him, and took its pay (in the form of a commission) off the gross sales price received, then crediting the remainder to appellee. The cumulative effect of the transactions resulted in the weighing and selling of all the cattle. The weights were material. The evidence upon which the case was submitted to the jury necessarily depended upon the weight of the cattle on or about October 15, 1951, and the value per pound of the weight. The exhibits complained of all showed a greater price per pound than the 16¢ per pound valuation appellee's witnesses testified that the 197 head of cattle were worth on that date. So, under provisions of Texas Rules of Civil Procedure, rule 434, there would be no prejudicial error in so far as concerned the price per pound appellee actually received for the cattle. The exhibits showed that in every instance he got more than 16¢ per pound.

The question then relates to whether appellant was prejudiced as the result of the statements in the exhibits about the weight of the cattle. From an examination of the statement of facts we find that the number of pounds going to make up the total weight of the 197 head of cattle is in the record as of October 12, 1951. There was some objection to this proof, but appellant makes no complaint of it on the appeal. Its complaint must be considered as to the weight of the same cattle, as weighed upon their sale, in lots, on October 15th, 16th and 17th. In addition to the matter upon weight as shown by the exhibits complained of, we find that there is evidence in the record, without objection, from which the weight of the cattle on October 15th, 16th and 17th could be ascertained. The evidence was oral and from the appellee himself, who was the witness testifying about the exhibits showing weight and which exhibits were introduced on the strength of his qualification of them as business records. In some instances the witness gave the number of pounds weight in a lot and in some instances he gave the price per pound at which he sold a certain lot and the total gross sales price received. In the instances of the latter class the number of pounds would be necessarily obtained by mathematical calculation. Nevertheless, such calculation gives the number of pounds. Any variation of this calculation from that obtainable from an addition of the poundage apparent from the exhibits demonstrates that any use of the exhibits results in more weight as a total and as an average per animal on October 15th, 16th and 17th, than the total weight testified to by appellee without objection, and therefore any effect that the exhibits might be said to have had could only have inured to the benefit of the appellant, and not to its detriment. Since under the provisions of Texas Rules of Civil Procedure, rule 434 the introduction of the exhibits into evidence did not prejudice the appellant, there is no occasion to examine further into the matter in a determination of whether there might be a circumstance where a similar introduction would occasion a reversal of another case.

The judgment is affirmed.