

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

———————————————————

No. 06-09-00127-CR

———————————————————

COREY DON LOUIS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 336th Judicial District Court
Fannin County, Texas
Trial Court No. 22697

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

This is an appeal by Corey Don Louis of his Fannin County jury conviction for capital murder in the death of two-year-old Teddy Lawrence.[1]

Because there was legally insufficient evidence that Louis intentionally or knowingly caused the death of the child, we reverse the capital murder conviction and acquit him of that charge. Due to jury charge error, we remand the case to the trial court for trial on the lesser-included offenses included in the jury charge.

I.      Facts of the Case

The story of the death of the child had its genesis when Teddy and his four-year-old sister, Beth, rose during the night and made a very big mess in the kitchen of their home, spreading food (including mustard), dog food, and household chemicals on the floor. This was not the first time the two children had performed these acts of domestic vandalism.

The children resided with their mother, Danielle Cuba, and her boyfriend, Louis, the appellant here. Also living in the house were Louis' son, John (fourteen at the time), and Cuba's infant son. At the time of the incident here, Louis' six-year-old daughter, Meg, was staying with them during spring break.

On the Saturday of Teddy's death, Cuba arose quite early in the morning, being the first of the adults to awake. Upon discovering the mess the children had made during the night, she woke up Louis and asked him to deal with the children as she commenced cleaning. Although Cuba did

---

[1]All children's names in this opinion have been replaced with pseudonyms.

2

not say she explicitly told Louis to discipline or beat the children because of their offense, there seemed to be a tacit understanding to that effect. Thus began what can only be described as a horrendous and excessive discipline session to punish the two children for their misconduct.

Louis engaged in three rounds of beatings of the children with a belt, primarily on their buttocks. First, he whipped the children shortly after he and Cuba awoke. Cuba testified that at some point, Louis sat down next to her, then said he was not yet tired, and so he got up and resumed his beatings. Louis then left for work, instructing that the children were to stand up facing a wall until he returned. However, having apparently forgotten something he expected to take, Louis returned inside the house to discover that Teddy was not standing and facing the hallway wall as instructed (the child was lying on the floor and appeared to be asleep). Seeing that Teddy was not standing against the wall as instructed, Louis whipped Teddy a third time. According to the testimony of the child, Meg, during this last beating, Louis said, "You should have been sleep [sic] when you was [sic] making that big mess. Don't try to be sleep [sic] now." When Louis finally did leave for work, he instructed Cuba to make the children continue standing and facing the wall until he returned, when he would resume beating them.

Meg also described some of Louis' beatings of the children as "hard" and some as "soft." Her description of the beatings corroborated Louis' own description of holding the children by an arm and beating them on their posteriors with a belt. Meg further testified that Louis called them very coarse names during this time and said, "I'm [not] going to stop whipping you until I go to

3

work." Meg said that Teddy and Beth both had difficulty staying on their feet and kept falling down.

After Louis left for work, Teddy continued to be unable to stand. At some point, he hit his head; there is conflicting evidence on how this happened. Meg said that the boy was crying and trying to hold on to Cuba's leg; in a move to disengage the child, she flung the boy away, causing him to hit his head "hard." John, Louis' fourteen-year-old son, said that when Cuba whipped Teddy, the boy fell back and hit his head on a board on the floor. Cuba, for her part, admitted kicking the child in the head. Meg also said that Cuba held a hot curling iron next to Teddy's skin, but Cuba denied having done this and the medical examiner found no evidence of burns on Teddy's skin.

Cuba's disciplinary acts culminated in tying Teddy's wrists to a clothes rod and hanging the boy in a closet when he was unable to remain standing. Meg said that Teddy's feet struggled to find a stool in the closet and that he kicked about while trying to get his feet on the stool. Cuba initially denied hanging him so high his feet did not touch the floor, but eventually she conceded that he might have been in such a position. Cuba maintained that she only left the boy hanging in the closet for five minutes at most, then let him down and put him to bed and that Teddy was still breathing when she put him to bed. Cuba also admitted that although Teddy suffered from asthma and was supposed to receive treatments for the malady twice per day, she had not given him his medication or treatment the two days prior to the incident date. After Cuba removed

4

Teddy from the closet, she put the children to bed and laid down herself. Sometime around 8:30 that morning, Cuba awoke and found Teddy stiff in bed—rigor mortis had set in. She called Louis at work, then called 9-1-1. When emergency medical technicians (EMT) arrived, they determined that the child was already dead and took his body to the local (Bonham) hospital. When one EMT heard Cuba say she thought the children may have ingested some "blue stuff," he suggested they return to the house for the rest of the children as a precaution against possible poisoning. By this point, Louis had returned from his job in Sherman back to the house in Bonham, where he was met by a Bonham police officer, who refused to allow Louis in the house.

In a video-recorded statement to law enforcement, although Louis first maintained that he had only spanked the children with his hand, he later admitted during the interview that he had employed a belt in the beatings. Nevertheless, he was adamant he did not beat the children sufficiently hard to cause the extensive subcutaneous hemorrhaging suffered by Teddy and the injuries (later diagnosed as rhabdomyolysis[2]) presented by Beth's wounds.

At the hospital, Louis told a Child Protective Services (CPS) investigator, "God knows we didn't do nothing [sic] wrong." The investigator, Dana Mangess, said she attributed this statement to a grieving parent. He was heard telling another CPS supervisor there was no foul play involved and that God does not make mistakes. Later in the day, Louis consented to a search

---

[2]Pediatrician Matthew Cox, M.D., testified rhabdomyolysis results from injury to muscle cells. In Beth's case, she had soft tissue injuries to her buttocks and back; the injuries resulted in elevated enzyme levels in her muscle cells. The enzyme levels in Beth's muscle cells were four times the normal level. Cox said this condition presented a substantial risk of death. Medical examiner McClain said that Teddy did not exhibit rhabdomyolysis because he died too soon; had he lived longer, he likely would have exhibited rhabdomyolysis.

5

of the home and cooperated with police. Two officers did remark they thought Louis had exhibited nervousness when they examined a belt found at the residence.[3] In the days after the death, Louis remarked to a co-worker that he had spanked the child and asked the co-worker, "[Y]ou don't think that killed him?"

CPS investigators and case agents arrived at the hospital. In following the agency's protocol when there has been a child's death in a home, they removed the remaining children to foster care. They discovered that Beth was in significant pain in her buttocks area; due to that pain, she could not sit, even to use the toilet. When CPS agents transported her to a foster family, great care had to be taken to allow the child to be able to sit in the car seat. En route to the foster family in the Dallas/Fort Worth area, the CPS agents were concerned about Beth's condition and stopped at a hospital in the Dallas area, where the child was admitted for treatment and diagnosed with rhabdomyolysis (severe injury to her muscle cells).

On the day of the child's death, Detective Terry Bee of the Bonham Police Department viewed the forensic interview given by Meg to CPS investigators. To that point, Bee said he had

---

[3]The record here is not entirely clear: Cuba testified the belt was broken in the beatings; the crime laboratory forensic scientist testified the belt she examined was "broken in half. But neither of the police officers who described searching the home and finding the belt described the belt as broken. There were at least two belts discussed and admitted at trial, neither of which was included in the appellate record. Adding to the confusion, two belts were crossed up, either when submitted by Bonham police or when examined at the crime laboratory—when Detective Bee opened the evidence envelope containing one of the belts, sealed since its examination at the crime laboratory, he removed a green robe belt, expecting a black robe belt. One or both of these may have been used to hang Teddy in the closet. The testimony seems to indicate Louis beat the children with a brown leather belt. Although Louis attacked the competency of the investigation throughout trial, we do not find the details of which belt was used or its condition especially germane to resolution of this appeal. Louis admitted beating the children with a belt; he claimed to be the only person who disciplined the children, and which belt caused the injuries to Teddy is not as important as Louis' mental status, as will be discussed below.

believed the cause of death was some form of poisoning or accident, based on statements made by Cuba and Louis and what Bee had seen at the family home. After watching Meg's interview, and based on statements made by her, Bee began to consider that Teddy's death could have been caused by something other than poisoning. The following afternoon (Sunday), Bee received a telephone call from the medical examiner's (M.E.) office. In short, the M.E.'s report indicated that Teddy had died from blunt force trauma, including extensive subcutaneous hemorrhaging in the buttocks and upper thigh regions, among other injuries. Based on this report, Bee changed the thrust of his investigation to determine whether the death was a homicide. On Monday, March 17, 2008, arrest warrants were secured for Louis and Cuba. Louis, not yet having been arrested, agreed to give a statement to Bee and Texas Ranger Brad Oliver. Sometime, apparently before this interview, Louis and Cuba made contact with Justice of the Peace Joe Dale, who had ordered an autopsy. Louis asked Dale whether Dale had ever heard of a spanking killing a child.

Also on Monday morning, Louis spoke to Bonham Police Officer James Boatman, who had been present at the Louis home on Saturday morning (the day of death). Louis related to him that Louis had seen or been informed of a preliminary autopsy report and he asked Boatman if "foul play" was being considered in regard to Teddy's death. At that time, Louis told Boatman that he "had to spank the child and he felt like deep in his heart he didn't do anything wrong at that time."

7

Shortly after this, Louis (still not under arrest or in custody) agreed to accompany Bee and Oliver to the Fannin County Sheriff's Office for an interview. In the video-recorded interview, admitted at trial and played for the jury, Bee asked Louis if it was possible that Louis had struck Teddy harder than he intended. He explained that the significant internal bleeding could not have been caused by the simple "spanking" or "whopping" Louis claimed to have administered. Louis nevertheless steadfastly maintained that the blows he administered were insufficient to have caused the massive injuries and he suggested alternatively that the child could have fallen in the bathroom. Louis attempted to demonstrate how hard he spanked Teddy and Beth by hitting the desk in the office where he was being interviewed. Louis said that Beth cried during her spanking, but Teddy "took it like a champ" and did not cry.

Joni McClain, deputy chief M.E. from Dallas County, performed an autopsy. McClain said her opinion on the cause of the child's death was "[h]omicidal violence including blunt-force trauma."

"Homicidal violence means the actions of another person caused the death of an individual." When asked if she could pinpoint exactly which injury caused Teddy's death, she said, "No, I can't just take one of those bruises out. I have to do everything in totality. So it's all of the various bruises combined, because you're losing blood into the soft tissue." She said that the term "homicidal violence" is used to include the possibility of asphyxia or lack of oxygen;

8

McClain's opinion on cause of death took into consideration the report given her by investigators

that the child had been hung in a closet:

> I'd had a history that the child was being hung by its wrists in a closet. So, that would - - you know, after a while, it gets hard to breathe if you're hanging there. So, that's the reason I went ahead and included that [asphyxia] along with the blunt-force injuries. So, that includes homicidal violence. At autopsy, you may not see anything with a suffocation or asphyxia. But as you're losing blood, blood is the thing that carries oxygen to the brain. So, he's losing blood, and it's harder to breathe if you're hanging. So, all of that together is the reason I called it homicidal violence including blunt-force injuries.

McClain said it was possible that the child could have bled to death from the injuries. In

answering a question about progressive suffocation, McClain said, "[Y]ou see all that blood that's

going into the soft tissue. And so, blood is what's carrying oxygen. So, you're getting less blood

that you can pump around." Later, the following exchange occurred:

> Q.      . . . . Is it possible to estimate the amount of blood that was lost in [Teddy's] buttocks and lower legs ?
>
> A.      Just extensive. No, it's just all in the other tissue.
>
> Q.      You can't pull it out of the fat.
>
> A.      No.

Teddy had six injuries to his head: some bruises and some scrapes. There were two

impact points on the head corresponding with a subdural hematoma[4] (bleeding between the brain

and the dura, a fibrous covering over the brain, beneath the skull), resulting in a small

amount—2 milliliters—of blood in or on the brain. McClain said there was not supposed to be

---

[4]McClain explained the structure as, "[Y]ou've got skull, then you've got dura, and then you've got brain."

9

blood on the brain. The boy had bruises on his wrists and one bruise on his lower left abdomen.

An unexplained anomaly not explored at trial was that the child had a blood-alcohol content of .06

percent and the vitreous fluid in his eyes contained .08 percent alcohol. No drugs were detected

in the child's system. He had bruises and scrapes on his buttocks and on the backs of his legs,

together with similar injuries on his back, all being consistent with having been hit with a belt.

McClain described the pattern marks on Teddy's back as "like a railroad track." There was

extensive hemorrhaging in the buttocks and backs of the legs, along with two small scrapes on the

penis. Although she acknowledged the child could have suffocated by being hung by his wrists, a

situation which could affect his ability to breathe, she would not specifically say whether the final

cause of death was due to asphyxiation or to any particular contusion or injury. Rather, she

looked at the totality of Teddy's injuries and concluded all of them, *in toto*, amounted to homicidal

violence. McClain did say that the extensive hemorrhaging at the buttocks and backs of the legs

was more severe than the brain injury.

## II.    Sufficiency of Evidence

Louis attacks the sufficiency of the evidence in three primary points of error:   (1) in point

one, that the evidence is legally insufficient to support the verdict; (2) in point three, that the

evidence is legally insufficient to prove he had the requisite mental state necessary to be found

guilty of capital murder; and finally, (3) in point four, that the evidence is factually insufficient to

support the verdict.[5]   Because analysis of the sufficiency of the evidence of Louis' *mens rea* is a necessary part of analyzing the sufficiency of the evidence to support the verdict, we will address these points together.

We begin with Louis' third point of error, in which he claims the evidence was legally insufficient to prove he had the requisite *mens rea* to be convicted of capital murder.   In reviewing the evidence for sufficiency, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.   *Jackson*, 443 U.S. at 318–19; *Brooks*, 2010 WL 3894613, at **1, 14.

Louis was indicted for intentionally or knowingly causing the death of a person who was under the age of six.   TEX. PENAL CODE ANN. § 19.03(a)(8) (Vernon Supp. 2010).   "Capital murder is a result-of-conduct oriented offense; the crime is defined in terms of one's objective to produce, or a substantial certainty of producing, a specified result, i.e. the death of the named decedent."   *Roberts v. State*, 273 S.W.3d 322, 329 (Tex. Crim. App. 2008) (citations omitted).   Due process requires the State to prove beyond a reasonable doubt every fact necessary to constitute the offense alleged.   *Id.* (citing *In re Winship*, 397 U.S. 358, 364 (1970)).   Under a

---

[5]In *Brooks v. State*, No. PD-0210-09, 2010 WL 3894613, at **1, 14 (Tex. Crim. App. Oct. 6, 2010) (a 4-1-4 decision with one judge joining the lead opinion with a concurring opinion and another concurring with the lead opinion and joining that concurrence), a plurality of the Texas Court of Criminal Appeals abolished the factual sufficiency review established by *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), and its progeny.   The plurality and the concurring judges agreed that the *Jackson v. Virginia*, 443 U.S. 307 (1979), legal sufficiency standard is the sole standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt.   *Brooks*, 2010 WL 3894613, at **1, 14.   Since the Texas Court of Criminal Appeals has abolished factual sufficiency review, we need not address the defendant's challenge to the factual sufficiency of the evidence.

11

hypothetically-correct jury charge, the State had the burden to prove that Louis intentionally or knowingly caused the death of Teddy, a child younger than six, by beating him.[6]

No evidence was presented that Louis ever held the intention to kill Teddy. Louis told police he was spanking the children as punishment for their having made a mess in the house; Cuba's version of events corroborated this. There is nothing in the testimony of the other two child witnesses (who were likewise present when the beatings took place) to suggest that Louis was engaged in anything more than disciplining the children, albeit to an excessive, horrific, and cruel degree. *Cf. Yost v. State*, 222 S.W.3d 865 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (evidence defendant regularly beat victim and made statements that he would kill her). Even the police, when questioning Louis, seemed of the opinion that Louis was attempting to discipline the children and did not realize how hard he was hitting them. Detective Bee said that when he questioned Louis, Bee did not think that Louis intended to cause Teddy's death and that Bee believed the death was accidental.

A more complex issue in this case is whether there was sufficient evidence to support a finding that Louis "knowingly" caused Teddy's death.

> (b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or

---

[6] We weigh the sufficiency of the evidence by considering elements of the offense as defined by a hypothetically-correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically-correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

12

> with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Tex. Penal Code Ann. § 6.03 (Vernon 2003). Proof of a culpable mental state is often made by circumstantial evidence. *Dunn v. State*, 13 S.W.3d 95, 98–99 (Tex. App.—Texarkana 2000, no pet.). Proof of knowledge is an inference that may be drawn by the fact-finder both from direct evidence and from evidence of the circumstances surrounding the act. *Dillon v. State*, 574 S.W.2d 92, 94–95 (Tex. Crim. App. [Panel Op.] 1978). A jury may infer intent or knowledge from any facts which tend to prove its existence, including the acts, words, conduct of the accused, and the method of committing the crime. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). "Indeed, mental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or admission occurs." *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998); *see also Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring). Intent can be inferred from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). In a murder case, evidence of a particularly brutal or ferocious mechanism of death, inflicted upon a helpless victim, can be controlling upon the issue of intent or knowledge. *Id*. Additionally, a culpable mental state can be inferred from the acts, words, and conduct of the accused. *Id*.

As with the above discussion on the absence of any evidence Louis intended to kill Teddy, we find no evidence Louis was aware that his conduct (i.e., spanking—or, more

13

accurately—beating Teddy) was reasonably certain to cause Teddy's death.  *See* TEX. PENAL CODE ANN. § 6.03(b).   All of the evidence pointed to Louis and Cuba doing what they did with the intent to discipline the children, but not attempting to kill them or to engage in conduct they knew was reasonably certain to kill them.   Again, we point to Louis' statements to police that he was disciplining the children and his denials that he hit Teddy with sufficient force or placement to cause the child's injuries.   The fact that Louis expressed an intention to resume the "discipline" when he got home from work indicates that he believed the child would be alive when he returned; he told Cuba to keep the children facing the wall in the hallway when he left.   Cuba testified she thought Louis' "spanking" was what a normal parent would do.   She told police Louis "spanked them like he always do [sic]," indicating that this was, unfortunately, the normal disciplinary process in the home.

Obviously, we are aware of our duty to defer to the jury's determination of the weight and credibility to be accorded the witnesses and the evidence; we are further cognizant that evidence of Louis' knowledge could be inferred from his acts and statements.   However, this is where we find the absence of evidence most telling.   From the descriptions of the events of that terrifying morning, it is clear that Louis and Cuba were anything but ideal parents and should not have been in the position of enjoying the joys and bearing the responsibilities of child-rearing.   As sad as it is to contemplate, we must take note of Cuba's statement that during this episode, she believed that Louis was simply engaging in an act of normal child discipline.   Obviously, although the brutality

14

and severity of the child's wounds must be considered, that still does not yield an inference that Louis was reasonably certain death would result from his conduct.

We contrast the instant circumstances with those addressed in *Duren v. State*, 87 S.W.3d 719 (Tex. App.—Texarkana 2002, no pet.). Duren was convicted of capital murder for having killed a young child who had been left in his charge. Duren gave inconsistent explanations of the cause of the child's injuries and ultimately claimed that he was mimicking a wrestling move and accidentally threw the child to the ground when he meant to throw the child to a padded chair. There were no witnesses to the incident. Evidence was presented that Duren had previously argued with and slapped the child's mother, and had a disagreement with her shortly before the child was injured. There was testimony from medical doctors that the child's injuries (which included blunt force head trauma and injuries along the spine, upper arms, and buttocks) could not have been sustained in the manner described by Duren. *Id.* at 724–25.

In *Montgomery v. State*, 198 S.W.3d 67, 84 (Tex. App.—Fort Worth 2006, pet. ref'd), the Fort Worth court found sufficient evidence to support Montgomery's capital murder conviction where Montgomery gave inconsistent stories about the means by which the child's injuries were sustained. There was evidence the child was injured while in the sole care of Montgomery and, importantly, a medical doctor testified that the child's head injuries were so significant that the person administering the wounds would have been reasonably certain the injuries would cause death. *Id.* at 87. Also taking into consideration Montgomery's relative size and strength as a

15

college football player versus the size of the sixteen-month-old victim, the appellate court found sufficient evidence that Montgomery knew his acts would cause death. *Id.* at 87–88.

In contrast, Louis and Cuba both had charge of the children here, and there is evidence that Cuba continued the abuse of Teddy after Louis left for work. In addition, other than initially lying about hitting the children with a belt, Louis eventually admitted using the belt but maintained he did not hit the children with sufficient force to cause the sustained injuries. Cuba testified that she believed that Louis spanked the children that Saturday morning just as any other "normal parent" would. When describing that morning's events, it was clear from Cuba's testimony that the "discipline" meted out was customary in that household when she said that she told Louis to "get up and get" the kids while she performed the perfunctory task of cleaning the mess. This, in her words, "was nothing new." Louis got his belt, which he did not do if he were not going to whip the children. This was apparently nothing extraordinary for this household. "To be aware that his conduct is reasonably certain to result in death, the actor must also be aware of the lethal nature of his conduct." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999).

In sum, there is simply no evidence that Louis knowingly killed Teddy, as "knowingly" is defined in the Texas Penal Code. We sustain Louis' third point of error and render an acquittal for the crime of capital murder.[7]

---

[7]Because the jury was instructed on lesser-included offenses, we would normally at this point proceed to examine whether the evidence supports judgment on one of those offenses. *Herrin v. State*, 125 S.W.3d 436, 443–45 (Tex. Crim. App. 2002). But because we find harmful jury error in the next part of our analysis, we will not consider the lesser offenses. Rather, we will remand for a new trial.

The foregoing discussion and conclusion regarding insufficient evidence to support the verdict for intentionally or knowingly causing Teddy's death render moot Louis' points of error claiming more generally of legal and factual insufficiency of the evidence, so we need not address them.[8]

## III.    Claims of Error in the Jury Charge

Louis makes two claims of error in the charge to the jury.   He first claims the trial court erred by inclusion of the following instruction in the jury charge:   "Intent or knowledge may be inferred by acts done or words spoken."   Next, he claims the trial court should have granted Louis' request to instruct the jury on the defense of mistake of fact.

### A.    Inferred Intent

In reference to the language in the charge concerning inferred intent, the Texas Court of Criminal Appeals has said inclusion of such language is an impermissible comment on the weight of the evidence and is, therefore, error.   *Brown v. State*, 122 S.W.3d 794, 800–01 (Tex. Crim. App. 2003).   It was observed that the "instruction marginally falls on the wrong side of the 'improper- judicial-comment' scale because it is simply unnecessary and fails to clarify the law for the jury."   *Id.* at 802.   Brown lodged an objection to the inclusion of this language.   Applying the test announced in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g), the Texas Court of Criminal Appeals found the error in the case before it was not calculated

---

[8]As for the claim of factual insufficiency, we would not address that claim in light of the Texas Court of Criminal Appeals' ruling in *Brooks*, 2010 WL 3894613, at **1, 14.   See footnote 5, supra.

to injure the defendant's rights, stating that the "instruction is mild, neutral, and an obvious common-sense proposition." *Brown*, 122 S.W.3d at 803.

Because Louis objected to the charge language, we will reverse if we find harm, taking into consideration all the evidence, the entire jury charge, and the parties' arguments. *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986); *Almanza*, 686 S.W.2d at 174; *Durden v. State*, 290 S.W.3d 413, 420 (Tex. App.—Texarkana 2009, no pet.). One must take into account that when charge error was preserved at trial by a timely and specific objection, that error must have been "calculated to injure the rights of [the] defendant." TEX. CODE CRIM. PROC. ANN. art. 36.19 (Vernon 2006); *Almanza*, 686 S.W.2d at 171. In other words, a defendant must have suffered "some" actual (rather than theoretical) harm from the error. *Almanza*, 686 S.W.2d at 171. If this usually relatively benign error were to be taken alone, we might be inclined to find this error "mild, neutral, and an obvious common-sense proposition." *Brown*, 122 S.W.3d at 803. However, because Louis' primary defense relied upon the position that he did not know that his "spankings" were sufficiently severe to result in the child's serious bodily injury or death, we consider this issue of preserved-charge error conjunctively with Louis' point of error complaining of the trial court's denying Louis an instruction on mistake of fact.

### B. Mistake of Fact

The trial court denied Louis' request for a jury instruction on mistake of fact. "It is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of

fact if his mistaken belief negated the kind of culpability required for commission of the offense." TEX. PENAL CODE ANN. § 8.02(a) (Vernon 2003). A defendant is entitled to an affirmative defensive instruction on every issue raised by the evidence regardless of whether the evidence raising the issue is strong, weak, unimpeached, contradicted, or unbelievable. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993). Generally, an instruction on the mistake of fact defense should be given when evidence raising the issue of whether the actor formed a reasonable belief about a matter of fact, if his mistaken belief negated the kind of culpability required for the commission of the offense. *Samford v. State*, 302 S.W.3d 552, 556 (Tex. App.—Texarkana 2009, no pet.).

In *Thompson v. State*, 236 S.W.3d 787 (Tex. Crim. App. 2007), the defendant was charged with intentionally or knowingly causing serious bodily injury to a child, a first-degree felony, and also with intentionally or knowingly causing bodily injury to a child, a third-degree felony. In that case, Thompson had beaten a student in his Bible study class with a tree branch, thereby causing significant injuries. The case hinged on a finding that the doctrine of transferred intent could apply to transfer of intent from a lesser offense to a greater offense. Thompson's intent to cause bodily injury was found to transfer to his having caused serious bodily injury. *Id.* at 800. The Texas Court of Criminal Appeals also stated that mistake of fact could have been raised under those circumstances and that although Thompson did not request a mistake of fact instruction, he would have been entitled to such an instruction had he done so. *Id.* Whether a defendant's

mistaken belief is reasonable is a matter for the jury or trier of fact to determine. *Granger v. State*, 3 S.W.3d 36, 38–39 (Tex. Crim. App. 1999).

In the charge given to Louis' jury, the following sentence is repeated eight times (first in the portion of the charge for capital murder and again on each of the lesser-included offense charges): "A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that a different offense was committed." We construe this as being a transferred intent instruction as codified in Section 6.04(b)(1) of the Texas Penal Code. TEX. PENAL CODE ANN. § 6.04(b)(1) (Vernon 2003).

*Thompson* is very similar to Louis' situation. Like Thompson, Louis' defense was that he intended to discipline the child, an action which would clearly entail bodily injury as defined by statute. Although at first blush the facts of this case would not seem to support the normal mistake of fact situation,[9] in light of *Thompson*, we find Louis was entitled to the mistake of fact instruction—which he requested but was denied at trial. We must reverse if we find "some harm" to Louis' rights. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Almanza*, 686 S.W.2d at 171. As discussed above, we review all the evidence at trial, the charge as a whole, and the argument of parties.

---

[9]For example: *Granger*, 3 S.W.3d at 38 (defendant entitled to mistake of fact instruction where evidence raised defensive theory he thought car was unoccupied when he fired into it with pistol); *Sands v. State*, 64 S.W.3d 488, 493 (Tex. App.—Texarkana 2001, no pet.) (defendant entitled to instruction where he testified he thought syringe of methamphetamine contained vitamin B-12).

20

Louis constructed his defense on two main pillars: (1) that Cuba might have killed the child after he left the house and (2) that he only intended to discipline the children, not to cause the death of either. In relation to the second of these defenses, as discussed above, Louis admitted to investigators that he had struck the child as a means of discipline, but maintained he had not struck the child with sufficient force to produce the resulting injuries. There was testimony from Cuba that she thought Louis' beating constituted normal parental disciplining. Louis made comments at the hospital such as, "God knows we didn't do nothing [sic] wrong" and was tearful. He asked two people, including Justice of the Peace Dale, whether it was possible for a spanking to result in a child's death. While it is true that some of this conduct or statements could be construed as suspicious or self-serving, we are concerned here with a review of all the trial evidence in assaying harm, not in a sufficiency review where we would be looking at the evidence in the light most favorable to the verdict.

We also look at the charge as a whole in considering any harm to Louis. As pointed out above, there was error in instructing the jury it could infer intent from acts or words spoken. We find this error (which would usually be not harmful) is exacerbated by the erroneous denial of the mistake of fact instruction. Both errors center upon a major part of Louis' defense—that he did not intend to cause death or serious bodily injury or know that his actions were reasonably certain to cause those results. The charge also provided for several lesser-included offenses: injury to a child by intentionally or knowingly causing serious bodily injury; manslaughter; injury to a child

21

by recklessly causing serious bodily injury; injury to a child by intentionally or knowingly causing bodily injury; injury to a child by recklessly causing bodily injury; criminally negligent homicide; and injury to a child by causing bodily injury by criminal negligence.[10] Louis' requested instruction on mistake of fact would have instructed the jury that if it believed Louis "through mistake formed a reasonable belief that the spanking that he administered to [Teddy] was not to the extent to cause serious bodily injury or bodily injury or death . . . or, if you have a reasonable doubt thereof, then you will find the defendant not guilty." Louis' two-fold defense hinged on (a) placing the blame for Teddy's death on Cuba, and (b) arguing he did not have the requisite mental status to be held responsible for the child's death.

As regards the parties' argument, the State made some brief references to whether the evidence proved that Louis knew his actions would cause Teddy's death. The State argued, "It wasn't in his heart to kill that baby. It wasn't. But he was pissed and he took that belt and he beat that two-year-old . . . ." The State stressed the amount of the beatings and that they took place over a span of time in more than one session. It further suggested that Louis raced home from work upon receiving word the child was not breathing in order to hide the belt and other evidence. The State concluded both sections of its closing arguments by saying that Louis "knew he went overboard [with the beatings]. He knew he did too much" and that Louis had gone "too far." Louis' closing argument reiterated his belief that the children were alive and that he believed them to be relatively well (or at least not at risk of death) when he left them and that the

---

[10]Louis objected to inclusion of these lesser-included offenses.

responsibility for the serious bodily injury and death lay at Cuba's feet. Counsel argued that Louis' conduct, such as racing home and comments made at the hospital, were consistent with an innocent mind, because when he left home, the children were alive. Defense counsel cited Louis' statements, while alone, caught on the video of his second interview, where he prayed that God would let the police see what really happened, as evidence of his innocent mind.

In this case, Louis' mental state was a hotly contested issue. The failure to instruct the jury on the defense of mistake of fact was an impediment to Louis' ability to present his defense that he did not have the requisite *mens rea* to be found guilty and to argue that defense to the jury. *See Palmer v. State*, 222 S.W.3d 92, 96 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (defendant impeached complainant with evidence she had made a false accusation against a third party; trial court charge erroneously instructed that the jury could only consider the false accusation if it found the accusation false beyond a reasonable doubt; effectively deprived defendant of impeachment evidence, resulting in egregious harm); *Hinojosa v. State*, 744 S.W.2d 319, 322–23 (Tex. App.—Corpus Christi 1988, pet. ref'd) (where defendant entitled to self-defense instruction, denial of instruction harmful).

Reviewing the evidence, the charge, and the arguments of counsel, we cannot say that the charge errors here did not cause some harm to Louis. "[T]he presence of any harm, regardless of degree, which results from preserved charging error, is sufficient to require reversal of the conviction." *Arline*, 721 S.W.2d at 351. The jury was effectively denied the opportunity to

23

consider Louis' most potent defense—that he did not know the degree of injury he was inflicting. While this defense may not seem reasonable to us, resolution of that reasonableness is a matter for the jury. *Granger*, 3 S.W.3d at 38–39. Finding that Louis did suffer some harm, we are compelled to sustain his eighth point of error and remand this case for a new trial.

There are various lesser-included offenses to the primary charge which involve the application of Louis' *mens rea* in a greater or lesser degree. It is the province of the jury, after proper instruction, to determine the reasonableness of Louis' mindset when inflicting the damages to the child.

There are other issues raised by Louis on appeal (e.g., the presence of an investigator/witness in the courtroom during a portion of the trial after imposition of "the rule" pursuant to Rule 614,[11] the alleged lack of corroboration of the testimony of Cuba as an accomplice, the refusal of the trial court to allow cross-examination of Cuba concerning her sexual liaison with a jailer while incarcerated after the child's death), which do not present reversible error under the circumstances of this case as it was tried. However, because the matters discussed above are dispositive of this case, we do not choose to delve deeply into a discussion of them.

We reverse the conviction of Louis for capital murder and render an acquittal of that offense. We remand this case to the trial court for a trial of the lesser-included offenses.

---

[11]TEX. R. EVID. 614.

Bailey C. Moseley
Justice

Date Submitted:     October 6, 2010
Date Decided:       December 15, 2010

Publish