

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

No. 08-24-00091-CR

---

Marvin Rex Lake, Appellant

v.

The State of Texas, Appellee

---

On Appeal from the 120th District Court
El Paso County, Texas
Trial Court No. 20210D01268

---

## MEMORANDUM OPINION

A jury convicted Appellant Marvin Rex Lake of capital murder of A.D., a child under ten years of age, and the trial court sentenced him to the mandatory sentence of life without parole. *See* Tex. Code Crim. Proc. Ann. art. 37.071 § 1(a); Tex. Penal Code Ann. § 12.31(a)(2). On appeal, Lake brings two issues: (1) he contends there is insufficient evidence to support his conviction; and (2) he argues the trial court erroneously instructed the jury. Finding no error, we affirm.

# I. BACKGROUND

A.D.[1] was born on March 2, 2020, to Araya and her husband, Brandon. On April 12, 2021, paramedics were called for assistance and they rushed A.D., who was then 13-months old, for treatment at a trauma level hospital. Medical personnel diagnosed him as having suffered severe blunt force trauma to his head. He died four days later on April 16, 2021.

By a three-count indictment, the State charged Lake with one count each of capital murder, murder, and injury to a child. The charging instrument alleged that Lake had intentionally or knowingly caused the death of A.D., a child under ten years of age, by striking the child's head with or against a hard object or surface. Lake entered a plea of not guilty and the case proceeded to a jury trial in which the following evidence was presented.

## A. Events of April 12, 2021

Araya testified that A.D. was born at 34 weeks gestation and spent his first three weeks of life in a neonatal intensive care unit due to a small brain hemorrhage diagnosed at birth. Ultimately, the condition resolved without need for further treatment. At his regular checkups, A.D. met all the typical baby milestones after birth. On March 3, 2021, Araya took A.D. to the pediatrician for his one-year-old checkup. She recalled that A.D. was doing "really great," and she had no concerns about his state of health. Araya generally described A.D. as a playful, sweet baby.

Araya and her friend, Allison Schneider, worked for a local hospital as housekeepers. On April 12, 2021, they were scheduled to work the same shift, from 3:00 p.m. to approximately 11:30 p.m. About a month prior, Araya and Schneider talked about a mutually beneficial arrangement to accommodate their commutes to work and child care needs. Schneider mentioned that "if her boyfriend at the time was able to watch [A.D] and [Araya] could bring [Schneider] to and from

---

[1] To protect the child victim's anonymity, we refer to him by his initials and only refer to his parents by their first names. *See* Tex. R. App. P. 9.10(a)(3).

work, it would kind of be a win/win," because Araya would have someone to watch A.D., and Schneider's children would not need to be awoken in the middle of the night, to ride along for her end of shift pick up. Based on the arrangement, they planned for Schneider's boyfriend, Lake, to babysit Schneider's two daughters—who were three years old and two months old—and for him to also babysit A.D., in exchange for Araya giving Schneider a ride to and from work. Although Lake had watched Schnieder's children before, he had not taken care of A.D. on his own.[2] About 2:00 p.m., Araya took A.D. to Schneider's apartment for Lake to babysit, and she picked up Schneider for a ride to work.

Both Araya and Schneider checked in with Lake during their shift. At her 5:00 p.m. break, Araya talked with Lake through a video call. A.D. was crying and screaming at the time. Araya suggested that Lake give him some juice, offering that he would likely fall asleep. At their 7:00 p.m. break, Schneider called Lake again. Araya did not see A.D. during the call as Lake said he was sleeping. Schnieder continued to text with Lake throughout their shift. At one point, Lake texted Schneider reporting that A.D. had torn a purple pillow. Schneider described that Lake seemed to be upset. Schneider told him she was not concerned because the pillow had no sentimental value to her.

Schneider and Lake continued texting, mostly expressing feelings for each other and otherwise staying in touch. Schneider noticed it took Lake a longer time to respond to her messages than his usual pattern. Sometime after 10:00 p.m., Schneider received a call from Lake. He reported that A.D. had thrown up a "red substance," and he described A.D. as "rag-dolling." Lake asked whether A.D. had any medical conditions. At that point, Schneider took the phone to Araya to talk with him. From there, she and Araya decided to leave work early and go straight to her apartment.

---

[2] Lake testified he watched A.D. a previous time, referencing an occasion when Araya and Brandon left A.D. with a military friend, his friend's wife, two other neighbors, and Lake for a period of three to four hours. A.D. was three months old at the time.

On arrival, Araya saw A.D. lying on Schneider's futon and he was completely unconscious. As she scooped him up to hold him, she noticed that his eyes were "kind of like rolling back" and "his breathing was very gargely." She asked for someone to call 911.

Lake spoke to the 911 operator describing that "for some reason, [A.D. was] rag-dolling," he was struggling to breath, and he would not wake up. When the operator asked whether A.D. was shaking or twitching, Lake replied in the negative. When the operator asked whether anything had happened, Lake responded that A.D. was sleeping earlier and, when he went to change him, the child threw up with a little bit of blood. Upon arrival, a paramedic observed that A.D. remained unresponsive, his oxygen saturation was low, his teeth were clenched, and his pupils were dilated and nonreactive. The paramedic also noted a bruise on the left side of A.D.'s neck. Based on his clenched teeth, low oxygen levels, and posturing, the paramedic believed the child exhibited signs of head trauma and they decided to divert to a trauma facility over a medical call. They transported A.D. to the University Medical Center as a Level One trauma. Araya rode with A.D. in the ambulance and Lake and Schnieder stayed behind at their apartment.

**B. Medical treatment and testimony**

A.D. was admitted to the El Paso Children's Hospital. Araya continued texting with Schnieder, who stayed up late with her, while Lake fell asleep. At one point, Schnieder woke up Lake to tell him that A.D. "was 100 percent brain dead." Lake responded by telling her it was late and for her to get some sleep. After four days of hospitalization without improvement, Araya and Brandon decided it was best to take A.D. off of the ventilator and to cease all other methods of life support. A.D. died on April 16, 2021.

At trial, the jury heard testimony from a treating physician and from the medical examiner, among other witnesses. Dr. Steven Ross, a pediatric radiologist, testified about the results of an ultrasound and CT scan taken when A.D. underwent treatment at the Children's Hospital. Ross

4

noted bruising in A.D.'s lungs and injuries to his brain. Based on radiologic studies, Ross diagnosed A.D. with a global-hypoxic injury to his brain, subarachnoid hemorrhage, and a depressed fracture of the left-parietal bone of the skull. Ross explained the scans had shown that A.D.'s skull was both fractured and dented, he suffered brain death, and his injuries were indicative of trauma. A.D. also suffered a contrecoup injury that caused a subdural hemorrhage to the right side of his brain despite the fracture occurring on the left side of his skull. Ross opined that a skull fracture, like the one A.D. experienced, would have been painful and would have caused a child to scream and cry. He explained the injury would have caused vomiting within 30 minutes and a severe headache. A child with a skull fracture would not be laughing or giggling after receiving such injuries. Ross further explained that the injury could only be caused by striking the skull with or against a hard object or surface. He testified that significant force was needed to cause the injuries observed and a fall from a child's standing position would be insufficient to explain A.D.'s injuries.

Following A.D.'s death, Dr. Mario Rascon, a forensic pathologist for El Paso County, performed an autopsy. Based on his examination, he opined that A.D.'s death was caused by blunt-force injury to the head. He detailed that A.D. had suffered numerous blunt-force injuries that were mostly unrelated to medical interventions that were also considered. Specifically, a blunt-force injury caused the fracture to A.D.'s left parietal bone of the skull which resulted in the hemorrhage that caused A.D.'s brain to swell. Although Rascon acknowledged that he could not conclusively state how A.D. received his injuries, he otherwise testified the type of fracture would result from the child's head striking with or against a hard object or surface.

## C. The investigation

On the morning of April 13, 2021, Lake voluntarily agreed to be interviewed by EPPD detectives. At the start of the recorded interview, detectives read him his rights and he voluntarily

5

waved them. Lake described that he babysat A.D. along with his fiancée's two children. When asked for an initial summary of the day's events, Lake described that A.D. had been fussy at times, slept most of the day, and he did not eat anything. He told the detectives he changed A.D.'s diaper around 10:00 p.m. Afterwards, because A.D. was a bit fussy, he picked him up. At that point, A.D. threw up a little bit of blood, or a red substance, then he seemed to slump over. Lake described A.D. as "rag-dolling," and not being responsive. Lake was worried so he called his girlfriend at work to find out if A.D. had eaten something red earlier or whether he had a medical condition. His girlfriend said A.D. had eaten a little bit of pizza the day before. Schneider and A.D.'s mother left work together and called 911 when they arrived at the apartment.

When detectives pressed Lake for details about events earlier in the evening, he described that, at one point, A.D. had almost fallen. He described that A.D. stood on the couch and just as he was about to fall backwards, he caught him by his shirt. Lake denied A.D. having hit his head but he believed that his pulling him by his shirt caused a bruise on his neck. After a break, detectives asked Lake to go over the timeline again and Lake repeated the same version of events. Lake stated that, after A.D. threw up, he did not pick him up in fear that he might have internal injuries. The detectives asked why he thought A.D. had internal injuries and Lake responded because he threw up red, which he thought could be blood. When the detectives asked what could have caused internal injuries, Lake said the only thing he could think of was when he almost fell off the couch and he "yoked" him up. Lake referenced A.D.'s hemorrhage from his birth as a possible reason for A.D.'s injuries.

As the interview continued, a detective told Lake that he did not think he was telling the whole story because his description failed to explain how A.D. could have slipped out of consciousness and into a medically induced coma. Lake responded that the only other thing he could think of was that his girlfriend had told him that A.D. might have ingested chemicals while

6

he was with Araya and Brandon the day before. He mentioned he had seen cleaning supplies in their kitchen. The detectives asserted that more had to have happened because A.D. had "significant injuries." When the detectives expressed their doubts about his explanation, Lake stated the only other thing he could think of was that he had played with A.D. during the hours he spent babysitting. He demonstrated with his arms that he had raised A.D. in the air "to get him to smile."

The detectives continued to ask Lake what else happened to cause A.D.'s injuries. Lake again stated that the only other thing he could think of was that he wrestled with A.D. on the couple's futon couch. He stated he would often do this with Schnieder's three-year-old daughter. The detectives then brought in a toy doll for Lake to demonstrate for them. Lake described that he would perform wrestling moves and "controlled falls" onto the futon. He demonstrated by raising the doll in the air above his shoulders, with his hand on the doll's back, and bringing it down in a fast motion. He described that once, his hand had slipped, and A.D. fell onto the futon without him catching him first. He said he checked on A.D. and he was still laughing and smiling. He denied that he ever dropped A.D. roughly onto the futon, because it was not cushioned well, but he admitted it was "very possible" that A.D. dropped "hard" onto it. Lake demonstrated another wrestling move where he raised the doll above his head and brought it back down in an abrupt motion. In another, he flipped the doll upward and then abruptly brought it back down. The detectives asked Lake how he would explain A.D. having a skull fracture, to which Lake said he did not understand how that happened. Lake then explained that the futon had a space where it was hard and that spot is where A.D. hit his head.

Adding further details, Lake described that he was upset with A.D. when he tore Schnieder's pillow. At that point, he picked him up in a football hold. He stated he did not think he squeezed hard but noted he has a problem controlling his strength sometimes. Lake again added

to his story telling the detectives he grabbed A.D.'s head between his hands and shook it back and forth while A.D. sat on the futon. He did this while playfully wrestling with him before he dropped A.D. onto the futon. Lake admitted that there were moments where he was frustrated with A.D. Lake again added to his story when he said A.D. might have "smacked" his head against the back of Lake's neck while they were wrestling. Lake said he did not initially tell the detectives about these details because he did not think of them. After more than three hours of questioning, the interview ended.

The State also presented evidence from EPPD's search warrant of Schnieder's and Lake's apartment. Specifically, the jury viewed photographs and video footage of the apartment showing vomit and red stains on the kitchen floor, the futon in the living room, dents in the refrigerator, and a dent in the bedroom door. The State elicited testimony from an officer about the condition of the futon in Schnieder's and Lake's apartment. The officer described the futon as having a metal frame with a "pretty thick" cushion on the front and a thinner cushion on the back.

### D. The defense case in chief

As part of his defense, Lake testified and recounted the same facts he told the detectives. Adding a detail he had not mentioned earlier, Lake testified that A.D. hit the left side of his head when he dropped him on the futon. Lake acknowledged he had changed a detail but he still maintained he did not intentionally harm A.D. He explained that he kept talking to the detectives because he wanted to help them figure out what happened to help A.D. get the help he needed. He stated that he did not immediately seek medical help because he was scared. Lake explained that he was wrestling with A.D. because he wanted to make him smile and laugh.

Also, as a part of his defense, Lake called Dr. John Galaznik, a board certified pediatrician who consulted on cases of physical injuries to small children. Galaznik testified that he reviewed A.D.'s medical records with an understanding that the child was accidentally dropped. As part of

his qualifications, he said he had reviewed several other case studies written about children and infants who had fallen and sustained injuries. Galaznik testified that a short distance fall of an infant might or might not produce a skull fracture that could have immediate onset symptoms or delayed symptoms.

After deliberating, the jury found Lake guilty of capital murder and the trial court sentenced him to life in prison. Lake appealed.[3]

## II. SUFFICIENCY OF EVIDENCE

In his first issue, Lake asserts the State failed to present sufficient evidence to support his conviction for capital murder. Specifically, he asserts there is a lack of direct evidence showing he intentionally or knowingly caused serious bodily injury to A.D.

### A. Standard of review

When reviewing the legal sufficiency of the evidence, a reviewing court examines the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Young v. State*, 14 S.W.3d 748, 753 (Tex. Crim. App. 2000). This standard requires that we defer "to the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). We may not re-weigh the evidence or substitute our judgment for that of the factfinder. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial.

---

[3] Lake's appointed trial counsel filed an appeal on his behalf. After his trial counsel submitted an *Anders* brief, we struck the brief and remanded the case to the trial court for appointment of new counsel. Lake's appointed appellate counsel subsequently submitted an appellant's brief on the merits.

*See Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016). We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution. *See Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). We do so because the jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *See Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *See Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015).

## B. Applicable law

As relevant here, a person commits capital murder if he intentionally or knowingly causes the death of a person who was under the age of ten. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(8); *Perez v. State*, No. 08-12-00340-CR, 2015 WL 4940375, at *6 (Tex. App.—El Paso Aug. 19, 2015, no pet.). "Capital murder is a result-of-conduct offense; the crime is defined in terms of one's objective to produce, or a substantial certainty of producing, a specified result, i.e. the death of the named decedent." *See Louis v. State*, 393 S.W.3d 246, 251 (Tex. Crim. App. 2012) (quoting *Roberts v. State*, 273 S.W.3d 322, 329 (Tex. Crim. App. 2008)).

A person acts (1) intentionally when it is his "conscious objective or desire to . . . cause the result" or (2) knowingly when he has "aware[ness] that his conduct is reasonably certain to cause the result". Tex. Penal Code Ann. §§ 6.03(a), (b); 19.02(b)(1). Proof of a culpable mental state is often made by circumstantial evidence. *Dunn v. State*, 13 S.W.3d 95, 98–99 (Tex. App.—Texarkana 2000, no pet.). A jury may infer intent or knowledge from any facts which tend to prove its existence, including actions of the accused before, during, and after the subject events. *See Bermudez v. State*, No. 08-23-00349-CR, 2025 WL 310490, at *11 (Tex. App.—El Paso Jan. 27,

2025, pet. ref'd) (mem. op., not designated for publication) (citing *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998) (en banc)); *see also Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (en banc).

Inconsistent statements or implausible explanations to law enforcement can provide evidentiary support for a conviction. *Nisbett v. State*, 552 S.W.3d 244, 266 (Tex. Crim. App. 2018). Intent can be inferred from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (en banc). In a murder case, evidence of a particularly brutal or ferocious mechanism of death, inflicted upon a helpless victim, can be controlling upon the issue of intent or knowledge. *Louis v. State*, 329 S.W.3d 260, 268–69 (Tex. App.—Texarkana 2010), *aff'd*, 393 S.W.3d 246 (Tex. Crim. App. 2012) (citing *Patrick*, 906 S.W.2d at 487).

**C. Analysis**

Lake maintains the record evidence is insufficient for a rational jury to have concluded he inflicted A.D.'s injuries intentionally or knowingly. He argues the only evidence introduced to support intentional murder of A.D. was his immediate failure to call 911 after he noticed there was something wrong with the child. Further, Lake contends that his explanation of wrestling with a 13-month-old and throwing him on a hard futon—while true and not easily relatable—is not evidence of an intentional act, but at best reckless, which he asserts cannot support the proper mental requisite for capital murder.

The evidence produced at trial showed that, when Araya left A.D. with Lake at about 2:00 p.m., he was in good physical condition and lacked physical injuries. Hours later, after A.D. remained in Lake's exclusive care, his condition materially deteriorated, leading to a call to 911 and hospitalization. Ultimately, the medical examiner determined that a blunt force injury to the head caused A.D.'s death. Rascon believed that A.D.'s injuries were caused by his head being

struck with or against a hard object or surface. In addition to a skull fracture, A.D. had contusions on his back, left buttock, left chest, and both thighs. Ross opined that the injury of A.D.'s skull fracture was likely caused by "[s]ignificant force" and that an accidental drop from a parent's arms would not be enough to cause the injury. He explained that A.D.'s type of injury is usually caused by "high-speed motor vehicle accidents," a drop from a flight of stairs, or a drop from a second story window.

In addition to the evidence of A.D.'s medical condition, the jury also heard from Lake that he wrestled with A.D., during the hours he supervised his care, and this wrestling caused A.D. to hit his head on the hard surface of the futon in the apartment. He demonstrated that he would raise A.D. up in the air and bring him down onto the futon with force. He also demonstrated how he shook A.D.'s head back and forth. There was also evidence that Lake was frustrated while taking care of A.D. The jury was also able to consider that Lake gave differing versions of his time spent with A.D. and he added to his story multiple times. Also, there was evidence that Lake failed to call 911 at any time after A.D. started exhibiting symptoms. He only spoke to 911 after Schnieder called, once she and Araya arrived at the apartment. Lake's post incident conduct was also shown to the jury in that he went to sleep after the ambulance departed with A.D. aboard, while Schneider stayed up communicating with Araya about A.D.'s condition. Lake continued to sleep even after Schneider informed him that she had learned that A.D. appeared to be brain dead. Also, a crime scene officer testified that, when he went to the apartment to secure it for investigation, Lake told the officer, "I figure you're here because of the incident last night, and under the circumstances, I have to go with you."

From the evidence presented, the jury could have reasonably inferred that A.D. sustained his fatal injuries during the eight-hour time period in which he was left under Lake's exclusive care. *See Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd) ("Texas case

law is replete with holdings that when an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies."); *Bearnth v. State*, 361 S.W.3d 135, 140 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (holding that evidence was sufficient to support conviction when adult had sole access to a child at the time the child's injuries were sustained).

Additionally, considering Lake's testimony in which he acknowledged he had wrestled with A.D. and caused his head to hit the futon, and the medical experts' testimonies on the amount of force necessary to cause the type of injuries sustained by A.D., the jury could have credited the medical expert's testimonies over Lake's version of events. *Bartlett*, 270 S.W.3d at 150. Further, the jury heard evidence from which it could reasonably infer Lake's intent from the severity of A.D.'s injuries and the medical testimony of the degree of force required to cause the type of injuries sustained and conclude they must have resulted from intentional blows to his head rather than from wrestling roughly with the child and causing accidental injuries as Lake claimed. *See Rodgers v. State*, No. 13-18-00453-CR, 2020 WL 4382260, at \*9 (Tex. App.—Corpus Christi– Edinburg July 30, 2020, pet. ref'd) (mem. op., not designated for publication) (finding severity of child's injuries, the relative size and strength of the parties, and medical testimony of the force used allowed the jury to reasonably infer appellant acted intentionally or knowingly on the occasion at issue); *Mayreis v. State*, 462 S.W.3d 569, 576 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (holding jury could have rejected appellant's explanation that injury was an accident when medical experts testified the injuries resulted from violent and intentional acts and reasonably concluded child suffered injuries through appellant's intentionally or knowingly inflicting them).

Finally, the jury could have also relied on other circumstantial evidence to infer intentional or knowing conduct. For instance, the evidence that Lake gave inconsistent statements and failed

to call 911 at any time before Araya and Schnieder arrived at the apartment. *See Perez*, 2015 WL 4940375, at *9 (holding failing to call 911 constituted consciousness-of-guilt evidence and was evidence of appellant's intent or knowledge to cause the child's death); *Kemmerer v. State*, 113 S.W.3d 513, 516 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (explaining that inconsistencies between the defendant's version of events and the medical evidence constituted circumstantial evidence that defendant was guilty of felony murder of a child left in defendant's care). Also, evidence of Lake's conduct following the incident supported a consciousness of guilt—continuing to sleep after hearing of A.D.'s serious condition and his statement that he figured he would have to go with a police officer the morning after. *See Brown v. State*, 657 S.W.2d 117, 119 (Tex. Crim. App. 1983) (holding conduct of a defendant subsequent to the alleged commission of a crime that indicates a consciousness of guilt is a circumstance tending to prove that the defendant committed the act with which he is charged).

Viewing all the evidence in the light most favorable to the verdict, we conclude the evidence presented at trial was legally sufficient to support the jury's verdict finding Lake guilty of capital murder. *Jackson*, 443 U.S. at 319. Lake's first issue is overruled.

## III. THE JURY INSTRUCTIONS

In his second issue, Lake contends the trial court erred by requiring the jury to end its deliberations, once it found Lake guilty of capital murder, and before it considered the other charged offenses. He argues the charged offenses, murder and injury to a child, that remained unaddressed were not lesser-included offenses of capital murder. Lake maintains the "stop-deliberating instruction" deprived him of his right to have the jury choose between each charge individually based on the evidence presented. For the following reasons, we find the trial court did not err.

## A. Relevant background

After both sides closed and rested, the trial court held a charge conference during which Lake requested inclusion of an instruction on manslaughter and criminally negligent homicide as lesser-included offenses of the charged offenses of capital murder and murder. The State responded that it had no objection to Lake's request. The conference ended without Lake requesting inclusion of a "benefit-of-the-doubt" instruction or otherwise objecting to the content of the jury charge.

As relevant to this appeal, the application portion of the jury charge set out the elements of the three charged offenses and the two lesser-included offenses as well. As to each offense, the charge also instructed the jury on the signing of identified verdict forms depending on whether the jury found Lake guilty or not guilty from the evidence presented and beyond a reasonable doubt. If the jury found Lake guilty of the offense described, it was directed to sign a verdict form labelled alphabetically by letter and to inform the bailiff that it had reached a verdict. Conversely, if the jury found Lake not guilty of the offense described, it was directed to sign another designated verdict form and to proceed to consider the next charge or lesser-included offense until completing their deliberations. Addressing five separate offenses, the verdict forms were labelled from the letter "A" to the letter "J." For example, the paragraph addressing "Count I - Capital Murder" included the following instructions:

> If you find from the evidence beyond a reasonable doubt that on or about the 12th day of April, 2021, . . . [Lake], did then and there, intentionally or knowingly cause the death of [A.D.] by striking [A.D.]'s head with or against a hard object or surface, and [A.D.] was an individual under ten years of age, you shall find [Lake] guilty of capital murder as alleged in Count I of the Indictment (Verdict Form "A"). If you so find, sign Verdict Form "A" and *inform the bailiff that you have reached a verdict*.
>
> Unless you so find beyond a reasonable doubt or if you have a reasonable doubt thereof, you shall find [Lake] not guilty of capital murder as alleged in Count I of the Indictment (Verdict Form "B"), *then proceed to consider Count II*. (Emphasis added.)

15

The application paragraph of each other offense included similar language. The jury charge also instructed the jury on the manner of deliberations.

After the trial court read the entirety of the charge to the jury, the jury retired to deliberate. Following an initial period of deliberations, the trial court announced to the parties that the jury had reached a verdict. Upon receipt of the verdict from the bailiff, the trial court asked counselors to approach for a brief conference at the bench. There, the trial court noted: "They have this, but then they filled out all the other forms, too." Specifically, as included in the clerk's record, multiple verdict forms were signed by the presiding juror as follows: verdict form "A" indicating the jury found Lake guilty of capital murder; verdict form "D" indicating the jury found Lake not guilty of murder; verdict form "E" indicating the jury found Lake guilty of injury to child, and also answering a special issue in the affirmative and finding that Lake used a deadly weapon, to wit, a hard object or surface during the commission of the offense; verdict form "G" indicating the jury found Lake guilty of manslaughter; and, verdict form "I" indicating the jury found Lake guilty of criminally negligent homicide. The bench conference concluded without further comment. The trial court then announced it planned to send the jury back to continue deliberating. Providing further instruction, the trial court addressed the members of the jury, stating:

> I need you to read the charge, it instructs you about how you fill out the verdict forms. Follow that carefully. We'll stand in recess until you advise that you have reached a verdict. And to be clear, I'm going to send back the original charge with new verdict forms.

Following a recess, the jury returned a verdict and entered the courtroom. This time the presiding juror only signed verdict form "A" indicating the jury found Lake guilty of capital murder. All other verdict forms were left blank. After reading the verdict aloud, the trial court polled the jury and each juror confirmed the verdict reflected their individual verdict.

The trial court accepted the verdict and excused the jury. Lake then moved for a mistrial "based on the conflicting juror forms, which were received." Defense counsel argued: "the

defendant was found not guilty on murder with a subsequent conviction on capital murder, [which] would be inconsistent with that previous finding." The trial court denied the motion for mistrial and imposed punishment of an automatic capital-life sentence.

### B. Standard of review

Trial courts must "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case[.]" Tex. Code Crim. Proc. Ann. art. 36.14; *Mendez v. State*, 545 S.W.3d 548, 551–52 (Tex. Crim. App. 2018). Thus, "alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012).

We review complaints of jury-charge error under a two-step process, considering first whether error exists. *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). If error does exist, we then review the record to determine whether the error caused sufficient harm to require reversal. *Id.* If the defendant preserved error by timely objecting to the charge, an appellate court may reverse if the defendant demonstrates that he suffered some harm as a result of the error. *Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009). If the defendant did not object at trial, we only reverse if the error was so egregious and created such harm that the defendant did not receive a fair and impartial trial. *Id.* at 26.

### C. Analysis

Lake complains that the indicted charges of capital murder, murder, and injury to a child, are separate, independent crimes of each other, and neither murder or injury to a child are lesser-included offenses of capital murder. He maintains the jury could convict on each of the different charges if the evidence supported required findings. In other words, he argues that conviction on one charge did not end the deliberation of the other two remaining counts of the three-count indictment. As a result, he claims the verdict forms returned and accepted by the trial court reflect

17

that a charge of murder and injury to child are still left pending and a new trial with proper jury instructions is warranted under these circumstances. For two reasons, we disagree.

First, Lake's contention made only in passing—that murder and injury to a child are not lesser-included offenses of capital murder—is contrary to our precedents. *See Rios v. State*, No. 08-06-00211-CR, 2008 WL 4351133, at *5 (Tex. App.—El Paso Sept. 24, 2008, no pet.) (not designated for publication) (holding injury to a child is a lesser-included offense of capital murder); *Gadsden v. State*, 915 S.W.2d 620, 622 (Tex. App.—El Paso 1996, no pet.) ("Criminally negligent homicide may be a lesser included offense of involuntary manslaughter, which may be a lesser included offense of murder, which may be a lesser-included offense of capital murder."); *see also* Tex. Code Crim. Proc. Ann. art. 37.09(1) (providing an offense is a lesser-included offense if "it is established by proof of the same or less than all the facts required to establish the commission of the offense charged"). Additionally, his contention that two offenses remain pending is also unsupported. Because the jury convicted on the greater offense of capital murder, it had no duty to consider the lesser-included offenses of murder and injury to a child, and no further obligation remained for the jury to dispose of those charges. *See Campbell v. State*, 227 S.W.3d 326, 330 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("[O]nce the jury convicts an accused of the greater offense charged, having been properly charged as to that offense, it has no occasion to consider whether appellant might be guilty of the lesser-included offense." (citing *O'Pry v. State*, 642 S.W.2d 748, 765 (Tex. Crim. App. 1981) (en banc)). For these reasons, we reject Lake's complaint that two offenses remain pending.

Second, in challenging the language directing the jury to stop deliberating if they found him guilty of capital murder, Lake fails to cite to authorities in support of his contention. Tex. R. App. P. 38.1(i) (requiring an appellant's brief to contain appropriate citations to authorities and to the record for arguments made on appeal). Still, in liberally construing his argument, we

18

understand him to argue that the instruction's language prevented the jury from being able to consider the various offenses unconstrained by interference from the trial court. As the Court of Criminal Appeals has noted, however, this type of complaint concerns "transitional instructions" that "tell the jury when and how to proceed from deliberating about a greater offense to deliberating about a lesser-included offense." *Sandoval v. State*, 665 S.W.3d 496, 535 (Tex. Crim. App. 2022). As relevant to this case, Article 37.08 of the Texas Code of Criminal Procedure provides that: "In a prosecution for an offense with lesser-included offenses, the jury may find the defendant not guilty of the greater offense, but guilty of any lesser-included offense." Tex. Code Crim. Proc. Ann. art. 37.08. In *Sandoval*, this statutory provision was interpreted as reflecting the Legislature's contemplation "that a conviction on a lesser-included offense would necessarily be a verdict of acquittal on the greater offense, not simply a situation where the jury could not agree on the greater offense." *Sandoval*, 665 S.W.3d at 535.

Here, we particularly note that the application paragraph of the capital murder offense included more direction in context than the specific language challenged by Lake. The instruction additionally provided: "Unless you so find [Lake guilty of capital murder] beyond a reasonable doubt or if you have a reasonable doubt thereof, you shall find [Lake] not guilty of capital murder as alleged in Count I of the Indictment . . . then proceed to consider Count II." This type of transitional instruction requiring a jury to acquit the defendant of the greater offense before proceeding to a lesser-included offenses is generally referred to as an "acquittal first" instruction. *Id.* The same language appeared on each of the other four offenses included in the jury instructions (i.e., murder, injury to a child, manslaughter and negligent homicide).

In *Sandoval*, the Court of Criminal Appeals reiterated it had explicitly approved the use of "acquittal first" instructions. *Id.* at 535–36 (citing *Boyett v. State*, 692 S.W.2d 512, 516 (Tex. Crim. App. 1985) (en banc)) ("*Boyett* and the longstanding Texas common law preceding it support the

19

'acquittal first' approach."). Moreover, the Court added that Article 37.08 "further reinforces the conclusion that in Texas, a jury must be required to agree on an acquittal of the greater offense before it can return a conviction on a lesser-included offense." *Id*. at 537. There, although the charge required the jury to acquit the defendant of the greater offense before deliberating on the lesser-included offense, it did not include a benefit-of-the-doubt instruction requested by the defendant.[4] *Id*. However, again recognizing that the statute "says nothing about how deliberations must proceed," the Court assumed, without deciding, that "the jury charge should have included an explicit 'modified acquittal first' instruction and a 'benefit-of-the-doubt' instruction," as argued by the defendant. *Id.* It explained that a modified-acquittal-first instruction allowed the jury "to deliberate in the order it sees fit" but requires "that it acquits the defendant of the greater offense before returning a verdict on the lesser included offense." *Id.*

Proceeding to consider the question of harm, the Court concluded that neither "some harm" nor "egregious harm" resulted from the charge as given. *Id.* at 537–38. Because the charge was read in its entirety before closing arguments and jury deliberations, the Court determined the jury was well aware of the distinguishing elements between the higher and the lesser-included offenses of the case. *Id.* at 538. The Court concluded that it saw "no practical difference between what [the given] instructions required of the jury and what a 'modified acquittal first' and Appellant's proposed 'benefit-of-the-doubt' instruction would have required." *Id.*

On review, we are guided by *Sandoval's* reasoning in rejecting Lake's complaint. Although he does not argue that a benefit-of-the-doubt instruction or a modified acquittal first instruction should have been given, he does contend the trial court erred by including the acquittal-first

---

[4] Sandoval's proposed jury charge rejected by the trial court contained the following instruction: "If you believe from the evidence, beyond a reasonable [doubt], that the defendant is guilty of either capital murder or murder, but you have a reasonable doubt about which offenses he is guilty of, you must resolve the doubt in the defendant's favor. In that situation, you must find him guilty of the lesser offense of murder." *Sandoval v. State*, 665 S.W.3d 496, 533 (Tex. Crim. App. 2022).

instruction. But *Sandoval* reiterated our higher court's approval of such approach. *Id*. at 535. Moreover, we have previously applied *Sandoval*'s holding to an acquittal-first instruction that provided: "If you all agree the state has failed to prove beyond a reasonable doubt, one or more of the elements 1 and 2, you must find the defendant not guilty and proceed to consider the lesser included offense of Deadly Conduct." *Galvan v. State*, No. 08-23-00346-CR, 2026 WL 889931, at *35 (Tex. App.—El Paso Mar. 31, 2026, no pet. h.) (mem. op.). There, we concluded there was no practical difference between a properly worded acquit-first instruction and a benefit-of-the-doubt instruction when the entire charge was read to the jury and the jury was instructed to consider the jury charge as a whole in its deliberations. *Id.* at *36.

We conclude the transitional instructions here were not erroneous. Moreover, because the record demonstrates the trial court read the entire charge to the jury before deliberations began and the instructions directed the jury to consider "all the evidence in the case," and to understand it was "bound to receive the law from the Court as it [was] given to [it] in [the] charge," if error occurred, it was harmless. We reject Lake's complaint that the jury charge's instruction to stop deliberating if the jury found Lake guilty of capital murder was error and we overrule Lake's second issue.

## IV. CONCLUSION

We affirm.


GINA M. PALAFOX, Justice

April 7, 2026

Before Palafox J., Soto, J., and Chew, C.J. (Senior Judge)
Chew, C.J., (Senior Judge), sitting by assignment

(Do Not Publish)

21